GERONIMO V. BOGGS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentBoggs v. CommissionerDocket No. 6824-82.United States Tax CourtT.C. Memo 1985-429; 1985 Tax Ct. Memo LEXIS 203; 50 T.C.M. (CCH) 797; T.C.M. (RIA) 85429; August 15, 1985. Douglas E. Little and Robert M. Musselman,*205 for the petitioner. John C. McDougal, for the respondent. PARKERMEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: YearDeficiencySec. 6653(b) 1 Addition1973$264,596.58$132,298.29197459,215.6629,607.83197527,476.5513,738.28197624,042.4512,021.23After concessions, the issues remaining for decision are: (1) Whether certain deposits made by petitioner into various Canadian banks during his 1973, 1974, and 1975 taxable years represent unreported taxable income as determined by respondent through use of the bank deposits method of reconstructing income; (2) Whether the interest earned on the above deposits and on the various other bank accounts into which these deposits were subsequently transferred is taxable to petitioner during the years in issue; (3) Whether petitioner realized a long-term capital gain in taxable year 1974 from the involuntary conversion of a dwelling destroyed by fire, and, if so, the amount thereof; and (4) Whether petitioner is liable for the section 6653(b) fraud addition for*206 each of the taxable years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, second stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. I. General FactsPetitioner, Geronimo Vernon Boggs, resided in Luray, Virginia at the time he filed his petition herein, and currently resides in Crab Run, West Virginia. During the taxable years at issue, petitioner was married to Mary L. Boggs (Mrs. Boggs), with whom he has four children: Ages during TaxableNameYears 1973-1976Angela Beth17 - 20Anna Maria15 - 18Patricia Janotta12 - 15Geronimo Vernon, Jr.9 - 12For taxable years 1973, 1974, and 1975, petitioner and Mrs. Boggs filed joint Federal income tax returns (Forms 1040). For taxable year 1976, petitioner originally filed his return separately from Mrs. Boggs; however, during audit respondent allowed petitioner to elect joint filing status for taxable year 1976 and, in accordance therewith, *207 made several corresponding adjustments to petitioner's separate return to reflect this change in filing status, none of which are contested by petitioner herein. Petitioner is a dentist, now retired. After serving as a dentist in the United States Army, in 1962 petitioner opened a general dentistry practice in Luray, Virginia. In approximately 1968, petitioner also began to do prosthetic dental work, which involved fitting and supplying patients with dentures. In 1971, petitioner began to specialize exclusively in prosthetic dental work, and no longer performed general dentistry. Although the dentures were fitted in petitioner's office, they were manufactured by contract with outside laboratories. Petitioner's dental office consisted of a waiting room and four separate treatment rooms. The office was open four days per week from 10 a.m. until 4 p.m. Patients were seen on a "first come, first served" basis, and not by appointment. Petitioner saw about 30 patients a day. From August of 1973 through March of 1974, petitioner's license was suspended and he treated no patients. During this time the practice was maintained by Dr. David C. Buckis. 2 At the conclusion of his suspension, *208 petitioner resumed his dental practice and continued it throughout the years in issue. Petitioner's records indicate that he treated a total of 652 patients in 1973 and 1,268 patients in 1974. The parties have stipulated that petitioner's records of income and expenses reconcile to his tax returns filed for taxable years 1973, 1974, and 1975. For reasons set out below, the Court concludes that petitioner's records were incomplete. During 1973, petitioner charged approximately $39 to $45 for a single denture and $75 to $85 for a double set. The record contains no evidence as to the prices charged during the later years in issue, but they were at least equal to those prevailing in 1973. Gross receipts from petitioner's dental practice amounted to approximately $3,000 per*209 day during all of the years before the Court. The policy of petitioner's dental practice was to request payment in cash or by certified check, and a sign on display at the receptionist's desk indicated that payments were to be made in cash only. Although some payments were made by personal check, the great majority of the payments were in cash. Receipts for cash payments were generally given only if the particular patient requested one. Information regarding charges for dental services and lab expenses was recorded by petitioner or his office assistants on patient cards. A patient card generally indicated the patient's name, date of visit, type of treatment received and the charge therefor, payments made on such charges and date thereof, and the outstanding balance due, if any. Aside from the patient cards, petitioner's records of his dental practice consisted of cancelled checks, invoices from laboratories and other suppliers, and receipts for small items purchased by cash. A sample laboratory invoice for the dentures fitted by petitioner was introduced into evidence. Such invoice indicates the name of the patient for whom the denture was made, the type of denture made, the*210 date and the cost of the denture to petitioner. All of the dentures fitted by petitioner were manufactured by outside laboratories, and there should be a separate laboratory invoice for all of the dentures fitted by petitioner. The record does not show whether petitioner retained such an invoice for each of the patients he treated during the years in issue, but, if so, the invoices were not produced at the trial. While petitioner suggested at the trial that such invoices were obtainable from the various manufacturers themselves, he did not obtain them or make them available at the trial. The person generally in charge of petitioner's record keeping during most of the period here in issue was an employee named Janet Shenk. The record keeping performed by Ms. Shenk consisted primarily of putting fully paid patient cards into a box, where they were kept until tax time. Ms. Shenk did not total the cards on a daily or weekly basis. The numbering system employed for the patient cards was not sequential, and Ms. Shenk could not determine whether all of the cards were in the box at the end of each year. As fees for dental work were collected by Ms. Shenk or other employees, the money*211 was placed in a box and given to petitioner at the end of each day. No record of the total daily or weekly receipts was ever prepared or maintained by Ms. Shenk or any other employees. Petitioner was solely responsible for the disposition of the daily receipts. However, Ms. Shenk did make occasional deposits to petitioner's checking accounts when given a deposit slip and requested to do so by petitioner. During the six-month period in which the dental practice was conducted by Dr. Buckis, the finances were handled in essentially the same way, except that the daily receipts were accumulated until weekends and then given to petitioner. At the end of each year, Ms. Shenk Summarized petitioner's business income and expenses based on the cancelled checks, invoices, receipts, adding machine tapes of patient cards, and other figures given to her by petitioner. 3 The parties have introduced into evidence copies of the worksheets prepared by Ms. Shenks for petitioner's 1973, 1974, and 1975 taxable years. Except with respect to petitioner's 1973 taxable year, such workpapers, as they relate to petitioner's dental practice, consist exclusively of monthly and annual summaries of the expenses*212 of the dental practice, and contain no information as to the receipts or income generated thereby. As to petitioner's 1973 taxable year, a portion of the workpapers purport to deal with petitioner's net income from the practice on a quarterly basis, but the copy thereof introduced into evidence is largely illegible and appears incomplete in any event, since it contains no information concerning petitioner's gross income from which the purported net income figures were derived, instead merely listing the alleged amount of the quarterly net income. When Ms. Shenk completed preparation of the annual summaries, they were given to petitioner. Petitioner then gave the summary information to his accountants, the firm of Robert L. Hueston, C.P.A. (hereinafter the Hueston firm). Petitioner's 1973 Federal income tax return was personally prepared by Robert L. Hueston (Hueston) from information provided to him exclusively by petitioner. On the front of the Form 1040 was the stamped notation "This return was prepared by Robert L. Hueston without audit or verification*213 by him, from summarized figures supplied by taxpayer." At petitioner's request, Hueston listed petitioner's home address on the Form 1040 as "3303 12th St., Vernon, B.C., Canada," the address of certain real property located in Canada which petitioner had purchased in September of 1973. In accordance with Hueston's normal practice in preparing Federal Income tax returns, and also because of the Canadian address given by petitioner, Hueston inquired into the existence of foreign bank accounts owned by petitioner. Petitioner originally denied having any foreign accounts, but subsequently told Hueston he did have one foreign account with a value of less than $10,000. Accordingly, a Form 4683, U.S. Information Return on Foreign Bank, Securities and Other Financial Accounts, was attached to petitioner's 1973 return, indicating petitioner's "financial interest" in one or more foreign accounts, the total maximum value of which allegedly did not exceed $10,000. Petitioner denied having any Canadian income and mentioned no interest income from Canadian sources. Petitioner's 1973 tax return reported no interest income from Canadian sources. Petitioner subsequently approached Hueston in*214 the early part of 1977 and informed Hueston at that time that he had in fact earned approximately $10,000 of interest income from Canadian sources during his 1973 taxable year. Petitioner's 1974 and 1975 Federal income tax returns were prepared by Philip H. Sharpe (Sharpe), and accountant employed by the Hueston firm, again from information provided exclusively by petitioner. At petitioner's request, petitioner's home address on both returns was once again listed as "3303 12th St., Vernon, B.C., Canada." Petitioner again informed Sharpe that he had less than $10,000 in foreign accounts during his 1974 taxable year and, accordingly, a Form 4683 identical to that attached to petitioner's 1973 tax return was also attached to petitioner's 1974 tax return. No Form 4683 was attached to petitioner's 1975 tax return. Petitioner provided Sharpe with no information concerning interest income from Canadian sources nor from accounts maintained in his children's names for either taxable year 1974 or 1975. Neither petitioner's 1974 nor 1975 return reported any interest income from Canadian sources. With respect to petitioner's 1973, 1974, and 1975 taxable years, respectively, the summaries*215 of petitioner's purported income and expenses for each year which petitioner gave to either Hueston or Sharpe to prepare his tax returns for those years listed only the aggregate amount of petitioner's alleged gross receipts for each year. The summaries provided no information as to how such aggregate figure was derived nor corroboration thereof. Hueston and Sharpe used the aggregate figures for gross receipts given to them by petitioner, and attempted no independent verification of such amounts. Petitioner's 1976 tax return was prepared by a Mr. Michael E. Mares (Mares) 4 from information given to him by petitioner. An extension of time within which to file his return was granted with respect to petitioner's 1976 taxable year upon petitioner's representation that petitioner was "[i]n the process of trying to determine income received [sic] in Canada-working in cooperation with the local I.R.S. and the Canadian IRS." Attached to petitioner's 1976 return as filed is a letter from his counsel, Robert M. Musselman, indicating that petitioner's return was prepared on the basis of incomplete information, and that an amended return for such year would be filed as soon as certain*216 "missing" information became available. 5 Petitioner's 1976 return did not report any interest income from Canadian sources, nor did petitioner report any interest income earned from amounts on deposit in domestic bank accounts. A Form 4683 attached to petitioner's 1976 Federal income tax return indicated that petitioner had a financial interest in 25 or more foreign accounts. II. The Bank DepositsDuring the years in issue, petitioner made numerous trips to Canada. 6 During the taxable years 1973, 1974, and 1975, petitioner deposited 7 the following amounts of United States currency in separate time deposits with the Bank of Nova Scotia, 44 King Street West, Toronto, Ontario (hereinafter the Bank of Nova Scotia), under the name Mr. Vernon Boggs, c/o General Delivery, Hamilton, Ontario: DateAmount2-27-73$207,500.004-11-73217,936.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,000.004-29-748 40,000.00*217 During taxable years 1973, 1974, and 1975, petitioner also deposited the following amounts of currency (U.S. or Canadian, as indicated) in time deposits with the Royal Bank of Canada, Main Branch, Vernon, British Columbia (hereinafter the Royal Bank), under the names indicated: Account NameDateAmountFundsG. Vernon Boggs9-11-739 $35,000CanadianGeneral DeliveryVernon, B.C.G. Vernon Boggs9-11-73$12,000CanadianIn Trust,3303 12th StreetVernon, B.C.G. Vernon Boggs9-19-73$ 5,300Canadian3303 12th StreetVernon, B.C.Mr. G. Vernon Boggs8-12-74$10,000U.S.In Trust,3303 12th StreetVernon, B.C.A. B. Boggs *9-09-74$21,000U.S.In Trust,3303 12th StreetVernon, B.C.Gere Boggs **10-28-7410 $10,000CanadianIn Trust3303 12th StreetVernon, B.C.G. Vernon Boggs11-10-75$ 5,000Canadian3303 12th StreetVernon, B.C.*218 III. Source of the DepositsA. The Lucas depositsPetitioner claims that the funds used to make the following deposits (hereinafter collectively referred to as the Lucas deposits) were all proceeds of "loans" 11 at seven percent interest from a Mr. A. W. Lucas (hereinafter Lucas): BankAccount NameDateAmountBank of Nova ScotiaMr. Vernon Boggs2-27-73$207,500.00Bank of Nova ScotiaMr. Vernon Boggs4-11-73$217,936.64Bank of Nova ScotiaMr. Vernon Boggs6-07-73$ 38,000.00Bank of Nova ScotiaMr. Vernon Boggs4-29-74$ 40,000.00Royal BankG. Vernon Boggs9-11-73$ 35,000.00Royal BankG. Vernon Boggs9-19-73$ 5,300.00Total$543,736.64Petitioner has presented no documentary evidence pertaining to these alleged loans. *219 Petitioner testified that he first met Lucas while on a hunting trip in Northern Ontario, Canada during the fall of 1972. According to the scenario presented by petitioner, petitioner alone in a boat on a lake noticed another boat, the occupant of which appeared to be clad in a white dress shirt with no coat. Thinking this was unusual in light of the then prevailing cold weather, petitioner after looking through his binoculars at the person in the white dress shirt, allegedly approached the other boat. Lucas, the alleged occupant of the other boat, appeared despondent and troubled to petitioner and initially resisted attempts at conversation. According to petitioner, he then noticed that Lucas was wearing a ring indicating he was a member of the Masonic lodge and, as petitioner was also a member thereof, began to talk to Lucas about lodge matters. As they kept talking, Lucas allegedly began to weep and confided in petitioner that he had been contemplating suicide when petitioner approached him. Lucas was allegedly planning to capsize the boat and drown himself in the icy waters of the lake, but petitioner allegedly persuaded Lucas to leave the lake, whereupon they went to Lucas' *220 camper, 12 which petitioner described as very large and the most beautiful he had ever seen. Petitioner allegedly stayed there with Lucas during the next seven to ten days, during which time he allegedly told petitioner of at least some of the events that had prodded his decision to commit suicide. According to petitioner, Lucas told him that he had formerly been a wealthy industrialist in Chile, that during the Communist takeover of that country, his factories had been taken, his wife and two daughters were "lost," and that he himself had escaped with only his life and a considerable sum of money. 13 Prior to his testimony at trial, petitioner had never revealed the exact circumstances of his alleged first meeting with Lucas to either the Internal Revenue Service (IRS) agents or the Canadian revenue agents involved in the investigation of his tax liabilities for the years in issue. Petitioner claims to have kept the story secret to avoid humiliating Lucas, allegedly reluctantly disclosing the story at trial only upon the advice of his counsel. Petitioner was unable to explain how disclosure of the story concerning petitioner's initial meeting with Lucas could humiliate Lucas*221 since Lucas is a fictitious name. *222 The name A. W. Lucas is admittedly fictitious. That name was utilized by petitioner to refer to the putative Chilean refugee in order to protect him from his alleged enemies, including the Central Intelligence Agency (CIA), who purportedly would kill Lucas if they knew where to find him. Although Lucas was said by petitioner to be currently residing in the United States and petitioner knew where and how to contact him, petitioner refused to divulge this information to the Court, asserting that he did not want to "pinpoint the target." 14 Although petitioner claimed to have last seen Lucas approximately five to six weeks prior to the trial, petitioner claimed to have heard from him since that time and stated that Lucas was aware of the present litigation. Petitioner claims that Lucas suggested the making of the loans during the initial seven to ten day period in which they*223 were together in Canada. During this period, petitioner had allegedly confessed to Lucas his love for hunting and fishing and his wish that he could afford to do so year-round. At trial, petitioner speculated that Lucas had offered to lend him the monies in question to somehow help petitioner realize that dream. As to the actual manner in which the various deposits were made, petitioner stated that Lucas did not give the total amount to him in a lump sum. With regard to the initial deposit to the Bank of Nova Scotia on February 27, 1973, petitioner stated that Lucas gave him the exact amount of the deposit, $207,500, in cash outside the bank door and petitioner took it inside and deposited it. The remaining monies were also deposited in cash, and were allegedly given to petitioner in cash on or about the dates he deposited such funds. 15 At trial, petitioner testified that the amounts deposited represented the total amount of monies "loaned" to petitioner by Lucas during the years in issue. *224 During the course of the investigation of petitioner's Federal income tax liabilities for the years in issue, petitioner has had three separate interviews with Special Agent David Weaver (Agent Weaver) of the Criminal Investigation Division of the IRS, such interviews occurring on December 2, 1976, January 14, 1977, and March 4, 1977, respectively. During each of these interviews, Agent Weaver asked petitioner about the total amount of cash he was allegedly loaned by Lucas. During the first two meetings petitioner would not respond, telling Agent Weaver he could not disclose the amount of the loans. During the third meeting, petitioner told Agent Weaver he had borrowed a total of $585,000 from Lucas. 16B. The remaining depositsOn July 13, 1973, petitioner redeemed six separate certificates of deposits (CD's) issued by the First National Bank of Luray, Virginia (the Luray Bank), receiving therefrom a total of approximately $9,395.60. Three of these CD's were payable*225 to "Dr. James E. Boggs as Custodian For Angela B. Boggs, Anna M. Boggs, Patricia J. Boggs and G. Vernon Boggs, Jr., Under the Virginia Uniform Gifts to Minors Act." Dr. James E. Boggs was apparently petitioner's brother. Each of these three CD's was endorsed on the back in the name of Angela Boggs as the registered owner and each was then co-signed in petitioner's name. 17 The remaining three CD's were payable individually to "Miss Maria Boggs," "G. Vernon Boggs, Jr.," and "Miss A. Beth Boggs," respectively. Each of these CD's was likewise endorsed on the back in the name of its respective payee as the registered owner and then co-signed by petitioner. See footnote 17. At trial, petitioner testified that the redemption proceeds from these six CD's constituted the*226 bulk of the $12,000 deposit on September 11, 1973 to the "G. Vernon Boggs, In Trust" account at the Royal Bank. Petitioner claimed that the account was opened in the name of "G. Vernon Boggs, In Trust" because the CD's from the Luray Bank were jointly owned by his children and the Canadian banks would not put more than one name on the account, instead utilizing the "in trust" designation to indicate that the account was jointly owned. Petitioner offered no support for this explanation other than his uncorroborated and self-serving testimony. When asked to explain the delay of almost two months between the July 13, 1973 redemption date of the CD's and the September 11, 1973 deposit date, petitioner could only speculate that the had planned to go to Canada on or about the redemption date but his planned departure had been delayed for some reason, offering no further insight into this conclusion. As noted earlier, the record does indicate that petitioner entered Canada on July 24, 1973 with $35,000 cash in his possession. Petitioner also claims that an unspecified portion of the $12,000 deposit to the Royal Bank on September 11, 1973 represented funds withdrawn from various passbook*227 savings accounts maintained in his name or his children's names at the Luray Bank. The parties have submitted as exhibits herein copies of the five separate passbooks pertaining to such savings accounts. The passbook to one of the savings accounts in petitioner's name indicates withdrawals therefrom in the amounts of $600.00 18 and $103.20 on April 27, 1973 and July 12, 1973, respectively. The passbook to a separate savings account in the name of petitioner's son indicates a withdrawal in the amount of $272.39 on July 12, 1973. The passbooks to the remaining savings accounts do not indicate a withdrawal therefrom in any amount within a reasonable proximity to the September 11, 1973 deposit to the Royal Bank. Although petitioner indicated at trial that he had records which would verify his claims, petitioner has offered no evidence to corroborate his testimony that withdrawals from these passbook savings accounts in any amount formed a part of the September 11, 1973 deposit to the Royal Bank. On*228 June 20, 1974, petitioner redeemed two additional CD's purchased from the Luray Bank, receiving therefrom a total of $7,599.66. One CD was in the face amount of $1,000 and payable to "Mrs. Ruby Boggs Remilli Or Dr. G. Vernon Boggs." The other CD was in the face amount of $5,100 and payable to "Mrs. Ruby Remilli." Ruby Boggs Remilli (Mrs. Remilli) is petitioner's mother. The address of the named payee(s) on each CD was that of petitioner's home address in Luray, Virginia, during the years in issue. Both CD's were endorsed on the back only by Mrs. Remilli as the registered owner thereof. Petitioner claims that the redemption proceeds from these two CD's went into and formed the major component of the August 12, 1974 deposit to the "Mr. G. Vernon Boggs, In Trust" account at the Royal Bank. When asked to explain the delay between the redemption date of June 20, 1974 and the deposit date of August 12, 1974, petitioner could once again only speculate that his planned departure had been delayed for some unspecified reason. During the course of his testimony, petitioner made reference to a $5,000 CD purchased in Vernon, British Columbia, for his mother "from proceeds somewhere," and*229 speculated that this CD could have been purchased with a portion of the proceeds from the two CD's redeemed at the Luray Bank on June 20, 1974. Although petitioner then reiterated his claim that all of the proceeds from the two CD's redeemed on June 20, 1974 went into the August 12, 1974 deposit to the Royal Bank, he could not verify this claim without checking certain "records" he claimed existed which he claimed showed the disposition of the proceeds from all of the CD's redeemed. No such records were introduced into evidence or produced by petitioner at trial. Petitioner also testified that approximately $1,600 to $1,700 of the $10,000 deposit to the Royal Bank on August 12, 1974 represented the proceeds received by petitioner from the sale of a camper in 1974.The parties entered into evidence as a joint exhibit a copy of a cashier's check in the amount of $1,440, payable to Clay Camper Co., and dated March 13, 1974 as evidence that petitioner had in fact purchased a camper during 1974. However, petitioner produced no evidence in support of his claim that the camper was then subsequently sold in 1974 other than his own vague, unsupported, and self-serving testimony. Petitioner*230 claimed the exceed of the amount deposited over the sum received from redemption of the two CD's and the proceeds from the alleged sale of the camper represented contributions from petitioner's or Mrs. Remilli's personal funds, or both. Petitioner has presented no documentary evidence indicating that any portion of the proceeds from the six CD's redeemed on July 13, 1973 or the two CD's redeemed on June 20, 1974 formed a part of the deposits to the Royal Bak on September 11, 1973 and August 12, 1974, respectively, although petitioner testified at trial that such records existed and were readily available. Instead, petitioner relies on the alleged chronological coincidence of the date certain CD's were redeemed with the date certain deposits were made to the Royal Bank as proof that the proceeds from the redemption of a particular group of CD's formed a portion of the particular deposit. In the absence of such purported records and without relying upon the alleged coincidence of the redemption and deposit dates, petitioner could not of his own knowledge and recollection affirmatively testify that a specific CD or group thereof formed a portion of a specific deposit. On August 26, 1974, petitioner*231 received insurance proceeds in the amount of $19,153.28 with respect to a dwelling fire at a farm known as "Toothacres" (see Part III, infra), on August 19, 1974. The parties have stipulated that $17,000 of these insurance proceeds fromed a part of the $21,000 deposit to the Royal Bank on September 9, 1974. Petitioner has offered no evidence as to the source of the remaining $4,000 deposited. On October 25, 1974, petitioner sold the house located at 3303 12th Street, Vernon, B.C. (hereinafter referred to as the Canadian residence) to a Mr. Norman Randall Brown for a total sales price of $45,000, payable $10,000 in cash as a down payment, the remaining $35,000 payable over the succeeding 25-year period and secured by a mortgage of like amount. 19 The mortgage indenture provided that petitioner was entitled to store certain personal property in the basement of the Canadian residence as consideration for a lower rate of interest on the mortgage payments. *232 At trial, petitioner testified that Mr. Brown had purchased the Canadian residence for his son, with Mr. Brown making the $10,000 down payment thereon and leaving the younger Brown to make the mortgage payments when due. Petitioner allegedly returned to Virginia shortly after the sale date and did not return to British Columbia until approximately one year or more thereafter, whereupon he learned that the younger Brown had defaulted on payment of all but two of the mortgage installments. Petitioner claims to have confronted Mr. Brown on the matter, whereupon a new "contract" was drawn. The only documentary evidence in the record related to any new "contract" between petitioner and Mr. Brown is the amendment to the mortgage indenture dated December 23, 1975, which supplied the previously omitted five-year payout provision bargained for by the parties. Petitioner claims that as a result thereof Mr. Brown paid him a total of $4,000, a portion of which represented 10 or 11 overdue mortgage payments, with the remainder attributable to damage the younger Brown's pet dog had inflicted on certain personal property petitioner had stored at the Canadian residence under the terms of the*233 mortgage indenture. 20C. Disposition of the DepositsThe $35,000 deposit to the Royal Bank on September 11, 1973, was withdrawn by petitioner shortly thereafter on September 24, 1973. Of this total amount, $3,000 thereof was redeposited into the "G. Vernon Boggs" account opened at the Royal Bank on September 19, 1973, bringing the balance thereof to approximately $8,300 as of that date. The balance of the withdrawal, $32,000, was then used by petitioner 21 to purchase the house located at 3303 12th Street, Vernon, B.C. which has been referred to hereinabove as the Canadian residence. *234 On August 21, 1975, the aggregate balance of the deposits at the Bank of Nova Scotia totalled $609,323,22. 22 On that date petitioner withdrew the total amount of such funds in the form of six bank drafts drawn on the Bank of Nova Scotia: five bank drafts in the face amount of $100,000 each, the sixth draft in the face amount of $109,323.22. The total amount withdrawn was then transferred and immediately redeposited to six other banks located in Toronto, Ontario, each such bank located within one block of the Bank of Nova Scotia. These new deposite were as follows: AggregateAmountForm ofBankDepositedDepositAccount NamesAddressesRoyal Bank1 $100,000   5 yr. CDVernon Boggs,1042in trust,Lakeshore Dr.of CanadaJane FisherSudbury, Ont.20 King St.5 yr. CDVernon Boggs,1042 Lakeshore Dr.in trust,Toronto, Ont.Herbert FisherSudbury, Ont.5 yr. CDVernon Boggs,1042 Lakeshore Dr.in trust,Carrie FisherSudbury, Ont.5 yr. CDHelen Fisher1042 Lakeshore Dr.and/orVernon Boggs 2Sudbury, Ont.5 yr. CDVernon Boggs1042 Lakeshore Dr.Sudbury, Ont.Bank at1 $100,000   5 yr. CDVernon Boggs,16 Court Manorin trust,Montrealfor Mary MartinNiagara, Ont.King & YongeSts.,5 yr. CDVernon Boggs,16 Court Manorin trust,Toronto, Ont.for Joyce MartinNiagara, Ont.5 yr. CD Vernon Boggs16 Court ManorNiagara, Ont.5 yr. CDVernon Boggs,16 Court Manorin trustfor Rosa MartinNiagara, Ont.5 yr. CDVernon Boggs,16 Court Manorin trust,for Jeff BoggsNiagara, Ont.Bank of1 $100,000   5 yr. CDVernon Boggs992 N.Lynn St.Montreal5 yr. CDJesse Vildoso,St. Catherines,in trust,1st Canadian5 yr. CDGladys Vildoso,Ont.and/orPlaceVernon Boggs 2Toronto, Ont.5 yr. CDMyrna Vildoso,922 N. Lynn St.in trust,5 yr. CDVictor Vildoso,St. Catherines,in trust,Ont.Canadian$100,000   Not StatedMr. Vernon612 Prince St.,BoggsImperialNorth Bay, Ont.Bank ofCommerce,Commerce Court,Toronto, Ont.Toronto$100,000   6 yr. CDMr. Vernon16 Hight St.Boggs,Dominion Bankin trust,Cobolt, Ont. 3Royal Bank$109,323.225 yr. CDBen McGuire1330 King St.and O/Eof CanadaVernon BoggsHamilton, Ont. 4King & YongeSts.,5 yr. CDVirginia1330 King St.L. McGuireToronto, Ont.and O/EHamilton, Ont. 4Vernon Boggs5 yr. CDBertram McGuire1330 King St.and O/E VernonHamilton, Ont. 4Boggs5 yr. CDLloyd McGuire1330 King St.and O/EVernon BoggsHamilton, Ont. 45 yr. CDMr. Vernon1330 King St.BoggsHamilton, Ont. 4*235 Some of the names and all of the addresses under which petitioner opened the accounts at the above-listed banks were fictitious. 23At trial, petitioner testified that the motivation for the above-described transfers was twofold. First, petitioner claimed the transfers were*236 in part directed toward an attempt to benefit from higher interest rates available from the transferee banks. Second, during the years in issue petitioner and his wife were having marital problems, 24 and petitioner claims the above transfers and use of fictitious names and addresses represent an attempt to conceal from his wife the money allegedly received from Lucas, thereby hoping to prevent such money from being "frozen" or seized by her in the event of a subsequent divorce action. Petitioner nevertheless deposited in excess of $100,000 of the money allegedly received from Lucas in his own name, albeit with a fictitious address. Petitioner also subsequently withdrew the balance of the funds on deposit at the main branch of the Royal Bank and transferred such funds into new accounts opened at the King Street branch of the Royal Bank as follows: 25PreviousDate ofAccountNewAccountTransferBalanceAccountsG. Vernon Boggs,2-2-76$13,697.18G. Vernon Boggs, in trust,in trust,1042 Lakeshore Dr.3303 12th St.Sudbury, Ont. 1Vernon, B.C.G. Vernon Boggs,2-2-76$9,561.98G. Vernon Boggs, in trust,3303 12th St.1042 Lakeshore Dr.Vernon, B.C.Sudbury, Ont. 1Mr. G. Vernon2-2-76$11,243.03G. Vernon Boggs, in trust,Boggs, in trust,3303 12th St.Vernon, B.C.A. B. Boggs,3-1-76$23,712.43Mr. A. B. Boggs 2in trust,3303 12th St.Vernon, B.C.G. Vernon Boggs,4-9-76$5,155.13G. Vernon Boggs, in trust,in trust,1042 Lakeshore Dr.3303 12th St.Sudbury, Ont. 1Vernon, B.C.*237 Petitioner stated at trial that he felt no need to place these funds into accounts under fictitious names to conceal them from his wife as he claimed such funds belonged to their children and his wife would not "take from thje children." Petitioner did not explain way he nevertheless apparently felt it necessary to give a fictitious address for these accounts. *238 The transferred funds remained in these various bank accounts until June of 1976, when petitioner withdrew a total amount of $739,952.90 as follows: 26AccountBankName(s)DispositionDatePayeeRoyal BankVernon Boggs, intrust, Jane Fisherof Canada,Vernon Boggs, intrust, Herbert Fisher20 King St.Vernon Boggs, in$100,000 bank draft6-30-76A.W.trust, Carrie FisherHelen Fisher and/orLucasVernon BoggsVernon BoggsBank ofVernon Boggs,in trust,for Mary MartinMontreal,Vernon Boggs,in trust,for Joyce MartinKing &Vernon Boggs$108,742.80 bank draft6-30-76A.W.Yonge Sts.Vernon Boggs,Lucasin trust,for Rosa MartinVernon Boggs,in trust,for Jeff MartinBank ofVernon BoggsMontreal,Jesse Vildoso,in trust,1stGladys Vildosa$107,593.00 bank draft6-15-76A.W.and/or Vernon BoggsCanadianMyrna Vildoso,Lucasin trust,PlaceVictor Vildoso,in trust,CanadianImperialBank ofMr. Vernon Boggs$109,551.10 bank draft6-30-76A.W.Commerce,LucasCommerceCourtTorontoDominionMr. Vernon Boggs,$108,572.13 bank draft6-30-76A.W.in trust,BankLucasRoyal BankBen McGuire andO/E Vernon Boggsof Canada,Virginia L.McGuire and O/EKing &Vernon BoggsYonge Sts.Bertram McGuire$100,000.00 bank draft6-30-76A.W.and O/EVernon BoggsLucasLloyd McGuire andO/E Vernon BoggsMr. Vernon BoggsRoyalBank ofCanada,G. Vernon Boggs,in trust,20 KingSt.RoyalBank ofCanada,G. Vernon Boggs20 KingSt.RoyalBank ofCanada,Gere Boggs,$69,866.76 bank draft6-30-76A.W.in trust,20 KingLucasSt.RoyalBank ofCanada,G. Vernon Boggs,in trust,20 KingSt.RoyalBank ofCanada,G. Vernon Boggs,$11,472.51 bank draft6-30-76G. VernonIn trust20 KingBoggs,St.in trust,RoyalBank ofCanada,Mr. A.B. Boggs$24,154.60 bank draft6-30-76Mr. A.B.20 KingBoggsSt.*239 Petitioner testified at trial that he was sure he instructed the Canadian banks as to the "cutting" of the above-listed bank drafts representing the withdrawal of the $739,952.90 from the Canadian banks. When asked to explain why the funds in four of those accounts which petitioner claims belonged to his children were consolidated into a $69,866.76 27 bank draft payable to Lucas, petitioner claimed that such was due to "confusion" on the part of the Canadian banks, as he was sure he had not given any instructions to that*240 effect. However, petitioner speculated that if he had so instructed the Canadian banks, such instructions would have been based on the prevailing currency exchange rates. 28The total amount withdrawn by petitioner, $739,952.90, consisted of principal in the total amount of $586,481.62 and interest earned thereon in the total amount of $153,471.28, attributable to the taxable years in issue as follows: YearInterest1973$21,449.92197447,308.43197551,368.79197633,344.14*241 In his pleadings filed herein, petitioner has conceded that respondent properly included in his income for the taxable years at issue the following amounts of interest earned on the Canadian bank deposits: 29yearInterest1973$7,316.97197410,613.91197511,688.0419765,994.46Petitioner indicated at trial that several factors prompted the withdrawal of the funds from the Canadian banks. Petitioner testified that the withdrawal was in part prompted by discussions he allegedly had with Lucas concerning a change in the manner of "investing" such funds, using them to acquire poultry farms in hopes of increasing the return thereon over that produced by the various interest-bearing bank accounts. 30 Petitioner indicated that it was he who suggested the purchase of poultry farms as an investment vehicle. However, what precipitated the first thought of withdrawing the money from Canada was the fact that the Canadian revenue authorities had recently seized some of petitioner's "personal" bank accounts in partial satisfaction of unpaid Canadian income*242 tax assessments outstanding against petitioner, and petitioner allegedly wanted to avoid being "caught with [Lucas'] money." 31 Petitioner had been assessed Canadian income tax of $73,052.66 by Revenue Canada for his 1974 and 1975 taxable years. A portion of the outstanding assessments was satisfied, inter alia, by seizure of funds on deposit in various Canadian bank accounts maintained by petitioner. In addition to seizure of these small bank accounts, Revenue Canada also garnisheed payments on the Brown mortgage and when Brown paid the balance of $34,816.75, Revenue Canada seized that amount and applied it to petitioner's Canadian income tax debt. As of May 16, 1980, petitioner was advised by Revenue Canada that there was still a balance outstanding on the assessments in the amount of $30,611.83. 32*243 Petitioner testified at trial that upon withdrawal of the funds from the various Canadian banks, he immediately gave the bank drafts to Lucas in Toronto in full payment of the "loans" he had allegedly received from Lucas. See footnotes 11 and 30 above. The timing of this alleged repayment was not pursuant to any previously agreed upon payment date between petitioner and Lucas. The record does not indicate whether the two bank drafts payable to "G. Vernon Boggs, In Trust" and "Mr. A. B. Boggs" were a part of this alleged repayment of the "loans." In any event, the entire $739,952.90 withdrawn from the Canadian banks was then transported to Stanley, Virginia. At trial, petitioner denied transporting the bank drafts from Canada himself, stating that he "assumed" Lucas transported the money to Virginia. D. The Lucas Savings AccountAt some point shortly before July 14, 1976, Mr. Cletus G. Waters (Mr. Waters), an officer of the Farmers & Merchants National Bank of Stanley, Virginia (the Stanley bank), met with petitioner and a man petitioner introduced as A. W. Lucas 33 to discuss methods of "investing" the money from the Canadian bank accounts. Mr. Waters knew petitioner*244 at this time, having frequently dealt with him in the past. The possibility of investing the money in some type of poultry operation was discussed during the meeting but no decision was reached at that time. The man introduced as Lucas said very little during that discussion, and instead generally deferred to petitioner.While Mr. Waters was not told who owned the money, the man identified as Lucas did not do or say anything to indicate that he alone owned the money. Mr. Waters assumed from the general discussion that the money belonged to both petitioner and Lucas. During the course of the discussion, Mr. Waters was shown one of the Canadian bank drafts, the amount of which is not disclosed by the record. He suggested that petitioner and Lucas deposit the money at the Stanley bank until they decided what to do with it. No attempt to cash the check was made, nor was an account opened at the Stanley bank at that time. *245 The only documentation ever presented to Mr. Waters to identify the man who was introduced to him as A. W. Lucas was a typewritten Social Security card, No. 234-72-XXXX, bearing the name of A. W. Lucas. That Social Security card was false. The parties have introduced into evidence a true copy of Social Security card No. 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, which belongs to an indicidual named Michael J. Altmeyer, a resident of Wheeling, West Virginia. Mr. Altmeyer is not the man petitioner introduced to Mr. Waters and later to his mother as A. W. Lucas. Mr. Altmeyer is a young man (21 years old in 1976), who is 6'7" tall. See footnote 33. Mr. Altmeyer has never lost or loaned his Social Security card to anyone, nor has he ever known anyone by the name of Geronimo Vernon Boggs, Boggs, Remilli, A. W. Lucas, or anyone using the alias of A. W. Lucas. The record does not disclose how Mr. Altmeyer's Social Security number or the false Social Security card bearing his Social Security number was obtained. Since that one meeting at the Stanley bank, Mr. Waters has neither seen nor talked to the man petitioner introduced to him as A. W. Lucas. 34 July 14, 1976, petitioner returned alone 35 to the Stanley*246 bank and opened a savings account in the name of A. W. Lucas (hereinafter the Lucas savings account), using Mr. Altmeyer's Social Security No. 234-72-XXXX. Petitioner brought with him the signature card, deposit slip, and any other document(s) required to open the savings account, all of such documents having previously been filled out and signed in the name of A. W. Lucas. As will be discussed below, the man introduced to Mr. Waters as A. W. Lucas did not sign these documents. Petitioner then deposited a total of $704,325.79 to the Lucas savings account, such initial deposit consisting of the following Canadian bank drafts: BankPayeeAmountCanadian Imperial Bank of CommerceA. W. Lucas$109,551.10Royal Bank of CanadaA. W. Lucas69,866.76Toronto-Dominion BankA. W. Lucas108,572.13Bank of MontrealA. W. Lucas107,593.00Bank of MontrealA. W. Lucas108,742.80Royal Bank of CanadaA. W. Lucas100,000.00Royal Bank of CanadaA. W. Lucas100,000.00Total$704,325.79*247 All of the bank drafts entering into the initial deposit to the Lucas savings account were already endorsed in the name of A. W. Lucas when petitioner brought them to the Stanley bank. Again, the man introduced to Mr. Waters as A. W. Lucas did not endorse these bank drafts. When asked at trial to explain why the $69,866.76 bank draft, slightly more than half of which petitioner claims represents money actually owned by his children, was deposited into the Lucas savings account along with the money petitioner claims belonged to Lucas, petitioner could only vaguely speculate as to the possibility of obtaining a higher interest rate from a larger deposit. The address given for Lucas on the deposit slip used to open the Lucas savings account was "General Delivery, Stanley, Virginia, c/o L. L. Bosley." Louis Lester Bosley is a postal clerk who operates an auto repair garage and owns a poultry farm near Stanley, Virginia. 36 Mr. Bosley does not know anyone named A. W. Lucas who might be associated with petitioner, and he has never authorized petitioner or anyone named Lucas to utilize his address for any purpose. *248 The signature of A. W. Lucas on the signature card for the Lucas savings account, as well as the endorsement in the name of A. W. Lucas on the back of each of the Canadian bank drafts which formed the initial deposit to that savings account, were made at petitioner's request by Virginia McGuire (Ms. McGuire). She was a former employee in petitioner's dental office and his girlfriend from about 1970 to 1979. 37 At trial, petitioner testified that since he did not know what means Lucas' alleged enemies (including the United States Government) possessed to analyze the handwriting and trace its author, Lucas himself did not sign any of the documents in evidence. See footnote 37. *249 Ms. McGuire has never met Lucas and knows of him only through petitioner. Petitioner asked Ms. McGuire if she would agree to sign Lucas' name to any papers petitioner brought to her for signature, informing her that he had checked with an attorney and that it was "legal" for her to do so. 38 Petitioner also told Ms. McGuire that Lucas' life would be in danger if his true identity and location were known. Petitioner then informed Ms. McGuire that she would receive a telephone call from Lucas asking her to sign the documents which petitioner presented to her. Ms. McGuire did subsequently receive a telephone call from a man who identified himself as A. W. Lucas and who told Ms. McGuire that she had his permission to sign his name to any papers petitioner presented to her. The voice of that man lacked any distinguishing accent, and the caller did not indicate where he was calling from or how he got her telephone number. Ms. McGuire has never received any written power of attorney or other document indicating that she had authority to sign Lucas' name on his behalf. Ms. McGuire has never spoken to the man who identified himself as Lucas subsequent to that one telephone call. *250 Ms. McGuire thereafter signed Lucas' name to any document or documents petitioner presented to her for such signature. All of the papers to which she signed Lucas' name were presented to her either face down or partially covered so that she could not see the details thereof. While Ms. McGuire was aware that certain of the papers she signed were checks, she never saw the amounts, dates, or payees thereof. E. Disposition of the Remaining Canadian Bank DraftsOn July 15, 1976, petitioner used the remaining two Canadian bank drafts drawn on the Royal Bank of Canada, one in the amount of $24,154.60 and payable to Mr. A. B. Boggs; the other in the amount of $11,472.51 and payable to G. Vernon Boggs, in trust, to purchase two CD's from the Stanley bank. The Canadian bank draft payable to Mr. A. B. Boggs was endorsed on the back thereof "A. B. Boggs" and also "A. W. Lucas;" the draft payable to G. Vernon Boggs, in trust was endorsed on the back thereof "G. V. Boggs" and also "A. W. Lucas." The endorsements in the name of A. W. Lucas on each were made by Ms. McGuire at petitioner's request. 39 The first of the two CD's purchased was in the amount of $20,000 and was payable to*251 "Angelia B. Boggs and G. V. Boggs joint tenants each w/right of survivorship;" the other CD purchased was in the amount of $15,600 and was payable to "Gere Boggs." 40 The amount by which the two Canadian bank drafts exceeded the face amount of the two CD's, $27.11, was paid in cash to petitioner. At trial, petitioner suggested that both CD's were subsequently cashed by his children, but his testimony on this point was very vague and unconvincing. See footnote 40. F. The Alleged Loan to the Valley Gas CorporationOn September 16, 1976, $10,000 was withdrawn from the Lucas savings account*252 in the form of a cashier's check payable to the Valley Gas Corporation, a propane gas dealership in which petitioner and his mother, Mrs. Remilli, each had an investment interest. The cashier's check listed the remitter thereof as "A. Lucas." The savings account withdrawal slip used to make the $10,000 withdrawal from the Lucas savings account was signed "A. W. Lucas," such signature being made thereon by Ms. McGuire at petitioner's request. 41 The $10,000 withdrawal was then used by petitioner to make a loan in that amount to the Valley Gas Corporation, allegedly in satisfaction of an outstanding obligation petitioner had entered into at the time of his initial investment therein to subsequently provide $10,000 of operating capital to the corporation. The funds were not actually paid out to petitioner, but were deposited directly into an account Valley Gas Corporation maintained at the Stanley bank. Petitioner testified at trial that the $10,000 withdrawn from the Lucas savings account represented an additional loan from Lucas to petitioner. 42*253 Petitioner and Mrs. Remilli had "bought in" to the Valley Gas Corporation after petitioner was approached by Mr. Charles W. Campbell (Mr. Campbell), a selesman for the corporation with whom petitioner had dealt over the years. Mr. Campbell was looking for investors to aid his planned purchase of the corporation from its then owners. The record does not indicate the exact time period as to when this transaction occurred, but we assume it was within relatively close proximity to the $10,000 loan on September 16, 1976. Petitioner allegedly discussed the matter with his mother and they decided to invest a total of $100,000 toward the purchase of the corporation. The record does not indicate what portion of this total amount was contributed by petitioner. When asked about the extent of his interest in the Valley Gas Corporation during the January 14, 1977 interview with Agent Weaver, petitioner denied that he had any interest in the Valley Gas Corporation, asserting that that was his mother's deal of which he had no knowledge. He did, however, indicate that he thought his mother had approximately $20,000 to $30,000 invested therein. At trial, petitioner denied making such statements, *254 claiming he had negotiated the whole transaction, and asserted that such statements would have been untrue if he had made them. 43At trial, Mr. Campbell testified that he had no personal knowledge as to whether petitioner had any of his own money invested in the Valley Gas Corporation, but it was Mr. Campbell's impression that the entire $100,000 investment had come from Mrs. Remilli. With regard to the $10,000 loan to the Valley Gas Corporation on September 16, 1976, Mr. Campbell denied that petitioner was the source of the loan, stating that the "deal" he had made called for Mrs. Remilli to provide the loan proceeds. 44 Mr. Campbell had never before heard of A. Lucas, who is listed as the remitter on the cashier's check used to transfer the funds from the Lucas savings account into Valley Gas Corporation's account. G. The Alleged Return of the Funds to Lucas*255 At or about the time of the alleged $10,000 loan from Lucas, and shortly after the Lucas savings account was opened, petitioner claims he became desirous of "divorcing" himself from his financial dealings with Lucas. Petitioner testified at trial that he realized he had gotten himself into a "jam" by dealing with Lucas, 45 and contacted an attorney named John Bushey (Mr. Bushey). According to petitioner, 46 Mr. Bushey advised him that since the "loan" had allegedly been repaid in full in Canada, the transaction had been "completed" and petitioner should get out of further dealings with Lucas. *256 To allegedly accomplish this end, petitioner contacted Mrs. Remilli at her home in Miami, Florida and, at petitioner's behest, she came to Luray, Virginia, allegedly to aid petitioner in returning to Lucas the money remaining on deposit in the Lucas savings account. At trial, petitioner testified that since he had "divorced" himself from the "transaction" with Lucas, he was hesitant to once again become involved, wanting to avoid having the money once again under his control. Petitioner claimed that Mr. Bushey suggested he use Mrs. Remilli to actually receive the cash and transfer it to Lucas, allegedly advising petitioner that by doing so he could avoid being considered as in receipt of the money upon its withdrawal from the Lucas savings account. See footnote 46. On Novenber 10, 1976, petitioner withdrew $694,000 from the Lucas savings account, leaving a balance therein of $325.79. The withdrawal slip used to make the withdrawal was payable to "A. W. Lucas" and was signed "A. W. Lucas," such signature having been made by Ms. McGuire at petitioner's request. The money was withdrawn in the form of a single cashier's check payable to "A. W. Lucas," such check being issued to*257 petitioner. Petitioner then left the Stanley bank with the cashier's check in his possession and apparently retained that check for over a month. 47On December 13, 1976, the day before petitioner was to be interviewed by the Canadian revenue authorities at his residence at Toothacres, Mrs. Remilli entered the Stanley bank and presented the $694,000 cashier's check payable to Lucas for payment. She requested that the entire amount thereof be paid to her in cash. The cashier's check had previously been endorsed in Lucas' name by Ms. McGuire at petitioner's request, and Mrs. Remilli co-endorsed the cashier's check as an accommodation party. Mr. Waters explained to Mrs. Remilli, as petitioner himself had been told earlier, the Stanley bank did not have that much cash available. Mrs. Remilli agreed to accept $24,000 in cash and the remaining $670,000 in cashier's checks, which Mr. Waters would arrange to have cashed at the First & Merchants Bank of Richmond, Virginia (the Richmond bank). Mrs. Remilli then*258 received the $24,000 in cash and the remaining $670,000 in the form of 13 cashier's checks in the amount of $50,000 each and one cashier's check in the amount of $20,000, all of which were payable to "Ruby B. Remilli" and listed A. W. Lucas as the remitter thereof. 48At trial petitioner denied having anything to do with placing the remaining $670,000 into several cashier's checks of smaller denominations instead of one large cashier's check, or with deciding the denominations of such*259 smaller checks. However, petitioner acknowledged that he had previously been informed by employees of the Stanley bank that they would not be able to cash the $694,000 cashier's check. Further, while Mr. Waters could not recall who decided the denominations of the smaller cashier's checks received by Mrs. Remilli, he did recall telling petitioner at one time that it might be easier to cash the $694,000 cashier's check if it were broken into smaller denominations. A week later, on December 20, 1976, Mrs. Remilli took the 14 cashier's checks to the Richmond bank to have them cashed pursuant to the arrangement made by Mr. Waters. 49 Petitioner accompanied his mother to the Richmond bank, but did not go inside with her to cash the checks. Instead petitioner waited out of sight, just outside the Richmond bank, until she returned with the cash. Pursuant to Mr. Water's instructions, Mrs. Remilli contacted a Mr. James J. Wilson (Mr. Wilson), and asked to have the cashier's checks cashed, preferably in "large" bills. As the Richmond bank did not have sufficient cash in "large" bills on hand to satisfy Mrs. Remilli's request, Mr. Wilson contacted the Federal Reserve Bank in Richmond, *260 Virginia, which then sent over the proper amount of cash by armored courier. Mrs. Remilli then endorsed each of the 14 cashier's checks in her own name and exchanged them for 6,700 new $100 bills, which were placed in a small valise she had brought with her. Mr. Wilson then accompanied Mrs. Remilli to her car, where she placed the valise in the trunk of her car. Before she left, Mrs. Remilli told Mr. Wilson that she was leaving for Florida where she planned to use the cash in a real estate transaction that required cash. Mrs. Remilli then left the Richmond bank, stopping to pick up petitioner who had been waiting outside. *261 Both petitioner and Mrs. Remilli testified that they then drove to a nursing home located in Richmond where they had allegedly arranged to meet with Lucas and return the money to him. Petitioner could not recall at trial the name of the nursing home, nor could he give directions on how to get there. He did, however, give vague testimony concerning the area of Richmond in which the nursing home was alleged to be and claimed he would be able to drive there. Petitioner and Mrs. Remilli both stated that they entered the nursing home with the valise containing the money, whereupon Lucas entered the building behind them. Petitioner then introduced Mrs. Remilli to a man he identified as Lucas. She and Lucas then stepped into a separate room to exchange the money while petitioner allegedly went to visit a friend of the family who was a patient in the same nursing home. 50 Mrs. Remilli claims to have never seen or met Lucas before, and knew who he was only because petitioner introduced Lucas to her. The description she gave for the man introduced to her as Lucas generally matches that of the man petitioner introduced as Lucas to Mr. Waters of the Stanley bank. *262 Once inside the room, Mrs. Remilli claims that Lucas took the $694,000 from her bag and put it into a valise Lucas had brought with him, taking a receipt for the money out of his bag and handing it to her. The receipt had already been signed when the person identified as Lucas took it out of his bag and handed it to her. Lucas then took the bag and left the room, and Mrs. Remilli allegedly joined petitioner in visiting their friend. Mrs. Remilli testified that she has not seen Lucas since the alleged return of the money to him on December 20, 1976 and does not know, or want to know, his whereabouts. Of the $694,000 petitioner claims to have returned to Lucas, in excess of $39,000 thereof represented monies withdrawn from certain Canadian bank accounts which petitioner has herein asserted belonged to his children, but had been deposited to the Lucas savings account. Petitioner acknowledged at trial that he had never asked Lucas to return this amount but had instead, allegedly acting on his attorney's advice, allowed Lucas to keep the money to "balance out" amounts petitioner claims to have owed Lucas, 51 regarding such as giving rise to an "indirect" loan from his children in*263 that amount. The "receipt" allegedly given to Mrs. Remilli by Lucas was a one-page, one-line typewritten document which stated merely "I have received $694,000.00 in full from Mrs. Ruby Remilli," and was signed A. W. Lucas, such signature having been made by Ms. McGuire at petitioner's request. At trial, petitioner denied preparing the receipt or*264 knowing who prepared it and also claimed he did not know whether the receipt was handwritten or typewritten, but admitted that it was he who submitted it to Ms. McGuire to affix Lucas' name thereto. Petitioner also testified that it was his understanding of the alleged exchange, based on what his mother told him thereof, that Mrs. Remilli had first given the signed receipt to Lucas, who then immediately handed it back to her in exchange for the money. This is contrary to her testimony that Lucas took the signed receipt out of his valise and gave it to her. 52Agent Weaver subsequently obtained from the Richmond bank the serial numbers*265 of the 6,700 new $100 bills Mrs. Remilli received upon cashing the 14 cashier's checks. An unsuccessful attempt to trace the money was initiated but then abandoned since to trace the serial numbers on 6,700 new one hundred dollar bills would be almost impossible without having some idea as to the geographical area in which they would be distributed. The parties have stipulated that none of the $100 bills has ever been traced to petitioner or any members of his family since those bills allegedly left Mrs. Remilli's hands. At trial, both petitioner and Mrs. Remilli testified that to their knowledge they had never subsequently received any portion of the $694,000 allegedly returned to Lucas. Petitioner did make a vague reference to a couple of "small loans" he had since received from Lucas, but did not know whether such money was part of the $694,000 allegedly returned to Lucas. Subsequent to the withdrawal of the $694,000 from the Stanley bank, an unspecified amount of previously accrued but theretofore uncredited interest on such funds was credited to the Lucas savings account. Petitioner thereafter personally closed the Lucas savings account, withdrawing such interest along with*266 the balance of the account left outstanding after the $694,000 was withdrawn, $325.79. Petitioner could not recall the exact date, but indicated that he did not close the Lucas savings account until approximately one year after the $694,000 withdrawal on December 13, 1976. The Lucas savings account was actually closed by petitioner at a branch of First & Merchants National Bank located in Shenandoah, Virginia, a nearby town. At trial, petitioner explained that the Stanley bank had been very crowded on the day he attempted to close the account and, as he would be going through Shenandoah that day, he just stopped at the Shenendoah branch and closed the account. Petitioner claims that this money was also returned to Lucas. At trial petitioner explained that he felt obligated to return this money to Lucas and since he did not want to ask his mother to help him again, he was the only one left to return the money even though it meant doing so over the alleged objections of his attorney, Mr. Bushey, who petitioner claims instructed him to avoid personally receiving the money. Aside from Mr. Waters and Mrs. Remilli, only one other person who has allegedly met Lucas testified at trial. *267 During the summer of 1982, Mr. Ray M. Dodson, the Sheriff of Page County, Virginia, was introduced by petitioner to a man petitioner said was A. W. Lucas. This occurred at the farm known as Toothacres. The description of the man petitioner introduced as A. W. Lucas generally matches that given by Mr. Waters and Mrs. Remilli. After speaking briefly with the man introduced as Lucas, Mr. Dodson left. Petitioner told Mr. Dodson nothing about Lucas, and the scope of their conversation was limited to whether Lucas was related to any of the Lucas families who resided in Page County, Virginia, Mr. Dodson indicating at trial that Lucas was one of the most common names in that county. Mr. Dodson stated at trial that he thought he had seen the man introduced as Lucas one other time when he was driving by the farm, Toothacres, a couple of months later, but did not stop to talk to him. 53*268 H. Statements by Petitioner Concerning Interest Generated by the DepositsAt the initial meeting on December 2, 1976 between petitioner and Agent Weaver concerning the investigation of petitioner's criminal tax liability for some of the years in issue, petitioner was questioned concerning his receipt of approximately $98,000 of interest income from Canadian banks. Petitioner acknowledged his receipt thereof, but told Agent Weaver that his own research of Canadian law had indicated that such interest income was not taxable until the year it was withdrawn from the banks, 1976, and that he would report it on his 1976 Federal income tax return when filed. Petitioner has made similar assertions to the Canadian revenue authorities, producing a black 1973 Canadian income tax return during his December 14, 1976 meeting with such agents in Luray, Virginia, and claiming he was told by employees of the Toronto District Taxation Office that as a cash basis taxpayer he was taxable upon such interest income only when he actually received it from the banks, i.e., in 1976. The Canadian revenue agents present at this meeting informed petitioner that such interest was taxable as it accrued. *269 Petitioner did not report the interest earned by the Canadian bank deposits on his 1973, 1974, 1975, or 1976 Federal income tax returns nor did he report the interest earned by the funds on deposit in the Lucas savings account during his 1976 taxable year. Petitioner also has not filed Canadian income tax returns for any of the years in issue. 54In his statutory notice of deficiency mailed to petitioner herein, respondent determined that certain of the deposits made by petitioner to the Royal Bank and Bank of Nova Scotia during his 1973, 1974, and 1975 taxable years constituted unreported income to petitioner. For taxable year 1973, respondent determined the entire amount of the deposits to the Canadian banks during such year, totalling $515,736.64, represented unreported income. For taxable year 1974, respondent determined the entire amount of the*270 $40,000 deposit to the Bank of Nova Scotia on April 29, 1974 and of the $10,000 deposit to the Royal Bank on August 12, 1974, respectively, and also $4,000 of the $21,000 deposit to the Royal Bank, on September 9, 1974, 55 constituted unreported income of petitioner. For taxable year 1975, respondent determined that $3,891.20 of the $5,000 deposit to the Royal Bank on November 10, 1975 56 represented unreported income. Respondent further determined that petitioner had unreported foreign interest income attributable to the funds on deposit in the Canadian banks as follows: 1973$21,449.92197447,308.43197551,368.79197633.344.14For taxable year 1976, respondent also determined petitioner had unreported domestic interest income in the amount of $10,683.27, attributable to the money on deposit in the Lucas*271 savings account in that year. In computing the amount of petitioner's alleged deficiency for each of the years in issue, respondent determined petitioner was liable for self-employment tax in the amounts of $864.00, $1,042.80, $1,113.90, and $1,208.70 for his 1973, 1974, 1975, and 1976 taxable years, respectively. Further, with respect to taxable years 1973, 1974, and 1975, respondent also utilized the maximum tax provisions of section 1348 to compute such deficiencies. On October 31, 1979, upon his submission of a voluntary guilty plea, petitioner was convicted by the United States District Court for the Western District of Virginia of having filed a false income tax return in violation of section 7206(1) with respect to his 1975 taxable year. The particular falsity in the return in that case was petitioner's omission of substantial amounts of interest income from the Canadian bank accounts. IV. Gain from Involuntary ConversionPrior to the years in issue, petitioner owned a farm located in Luray, Virginia, which was known as "Toothacres." There was located on that farm a two-story "A-frame" house, which petitioner estimated to be 24 feet by 24 feet on each level. 57*272 At trial, petitioner stated that he had built the cabin himself with the assistance of local carpenters at an estimated cost of $14 per square foot. 58During 1973, petitioner was named as a defendant in a medical malpractice action brought in the Circuit Court of Page County, Virginia. The action was subsequently dismissed when it was discovered that petitioner was not the dentist who had treated the plaintiff in that case. At trial, petitioner indicated he had been named in at least one other medical malpractice action, but that this action had also been dismissed as to him because he had been wrongly named as a party defendant. As discussed earlier herein, supra, petitioner and his wife were also experiencing marital difficulties during the years before the Court and a possible divorce was contemplated. Allegedly*273 as a result of their marital problems and petitioner's newly aroused fear that he could lose all his property in a medical malpractice suit because of his alleged inability to afford to carry professional liability insurance, petitioner claims that he and his wife decided to place all of their property in their children's names. In accordance with this alleged plan, on January 3, 1974, petitioner and his wife executed a warranty deed which purported to convey the farm, Toothacres, to their four children. 59 The signatures of petitioner and Mrs. Boggs on the deed were acknowledged before a notary public of Page County on February 14, 1974. Petitioner claims that after the deed was executed he and his wife then gave the deed to his two eldest children. However, petitioner expressly instructed them not to record the deed, instead "advising" them to place the deed in a safe deposit box at the Stanley bank and keep it there. The deed was not subsequently recorded. When asked to explain the reason underlying such "advice," petitioner indicated that he did so out of his concern that the children might lose the property as the result of a personal injury action brought against them or*274 through a partition proceeding in the event dissension arose among the children, and he sought to avoid such contingencies by placing the deed in the "control" of the eldest children. At trial, the parties submitted into evidence two separate exhibits which they have stipulated to be safe deposit box records of entry and which Mr. Waters identified as safe deposit box(es) located at the Stanley bank. Mr. Waters could not state for certain whether the entry records pertained to a single safe deposit box or to two separate safe deposit boxes. Mr. Waters speculated that the two documents may have merely represented a change in the entry record from used with respect to a single box, but could not be certain thereof. One of the entry records submitted as an exhibit designated the "renter" of the safe deposit box covered thereby as "G. V. Boggs or Angela Boggs," 60 and Mr. Water's stated that these people would have*275 access to that particular box. Mr. Waters could not discern from the other entry record who had access to the box covered thereby. While the entry records indicated that several of petitioner's children had entered the safe deposit box during the years in issue, these records did not indicate that petitioner himself had entered the safe deposit box during such years. However, under the procedures at the Stanley bank, persons other than those shown on the entry records as having actually entered the box could have had access thereto pursuant to the particular safe deposit box rental agreement. Only the rental agreement would specify those people having access to the particular box. Such rental agreements were not presented at the trial nor introduced into evidence herein. *276 During the course of the investigation into petitioner's criminal tax liability, petitioner at one point told Agent Weaver that he no longer owned Toothacres. Petitioner showed him the original copy of the deed purporting to transfer Toothacres to his children. 61 He also told Agent Weaver that the deed had not been recorded. At trial, petitioner denied having shown the original deed to Weaver, asserting instead that it was only a copy. With regard to the copy of the deed submitted as an exhibit herein, petitioner denied making such copy from the original deed himself, asserting that such copy had been made by Anna Maria, one of his children who had access to the safe deposit box. However, petitioner acknowledged that he obtained the entry records concerning the safe deposit box(es) which were submitted as exhibits herein without the aid of his children. The Court is satisfied that petitioner continued to exercise dominion and control over that deed throughout the years before the Court. *277 After the purported transfer of the farm, Toothacres, to his children and during the years in issue, petitioner continued to use Toothacres at his largely unfettered discretion. 62 Petitioner suggested at trial that he had an "understanding" with his children whereby he was not required to pay rent on the property, but would instead pay the property taxes thereon for the years in which he used the farm. Petitioner acknowledged that he had in fact paid property tax on Toothacres in certain of the years following the purported transfer thereof to his children. For taxable year 1974, Toothacres was listed for tax purposes in the name of petitioner and his wife; for taxable year 1975 it was listed in the name of "G. Vernon & Mary L. Boggs, c/o Beth Boggs, In Trust." The real property taxes*278 for 1974 were paid with a check drawn on a checking account at the Stanley bank, such check being signed by Angela Boggs who was then 18 years old; for 1975 the real property taxes on Toothacres for that year were paid by a check signed by Beth Boggs (presumably Angela Beth Boggs). The amounts paid in each year included real property tax assessments on property other than Toothacres. Neither petitioner's ex-wife nor any of his four children appeared or testified at trial, although petitioner asserted at trial that he was positive they would have appeared and testified if he had asked them to do so. On August 26, 1974, petitioner received insurance proceeds totalling $19,153.28 with respect to a fire which had occurred at Toothacres on August 19, 1974. Of that amount $17,000 was attributable to fire damage to the cabin located at Toothacres, allocable $12,000 to the dwelling itself and $5,000 to the contents thereof. The record does not indicate the nature of the property to which the remaining $2,153.28 was attributable, although the fact that such amount was paid to petitioner by a separate check issued by the United Services Automobile Association suggests the property insured*279 was an automobile. In his notice of deficiency issued to petitioner herein, respondent determined that the insurance proceeds received by petitioner in the amount of $19,153.28 represented taxable income to petitioner, and taking into consideration the deduction provided for by section 1202, increased petitioner's taxable income for taxable year 1974 by the amount of $9,576,64. 63ULTIMATE FINDINGS OF FACT 1. Petitioner had unreported income in the amount of $515,736.64, $54,000, and $3,891.20 for taxable years 1973, 1974, and 1975, respectively, as determined by respondent*280 through use of the bank deposits method of reconstructing income. 2. Petitioner had unreported interest income in the amounts of $21,449.92, $47,308.43, $51,368.79, and $33,344.14 for taxable years 1973, 1974, 1975, and 1976, respectively, from deposits in Canadian banks; petitioner also had unreported interest income in the amount of $10,683.27 for taxable year 1976 from deposits in domestic banks. 3. Petitioner's failure to report such amounts as income resulted in an underpayment of petitioner's tax liability for each of petitioner's 1973, 1974, 1975, and 1976 taxable years and a part of the underpayment in each year was attributable to fraud, i.e., a willful intent to evade tax. 4. Petitioner realized taxable income in the amount of $9,576.64 during taxable year 1974 from the receipt of insurance proceeds with respect to a dwelling fire at the farm, Toothacres. OPINION I. Unreported Income Evidenced By Deposits To Canadian BanksUtilizing what is essentially the bank deposits method of reconstructing income, respondent has determined the existence of unreported income in each of petitioner's 1973, 1974, and 1975 taxable years. It is well established that, in*281 the absence of adequate books and records, respondent may determine a taxpayer's income by a bank deposits analysis. Sec. 446(b); sec. 1.6001-1(a), Income Tax Regs.; Goe v. Commissioner,198 F. 2d 851, 852 (3d Cir. 1952), cert. denied 344 U.S. 897 (1952); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F. 2d 2 (6th Cir. 1977). Use of the bank deposits method is proper even when the taxpayer keeps books and records which support his return as filed. Campbell v. Guetersloh,287 F. 2d 878, 880 (5th Cir. 1961); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). The fact that a taxpayer's books and records are consistent with his income tax returns or are internally consistent with each other proves nothing more than that they are consistent; it does not establish that they are truthful or accurate. Davis v. Commissioner,239 F. 2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court.See Holland v. United States,348 U.S. 121, 131-132 (1954). Respondent is not required to accept a taxpayer's returns*282 or his books and records at face value. Holland v. United States,supra,348 U.S. 130-132. The mere making of a bank deposit does not of itself show that the sum deposited was income, but such deposits can be prima facie evidence of income. Goe v. Commissioner,supra at 852; Estate of Mason v. Commissioner,supra,64 T.C. at 656-657; Reaves v. Commissioner,31 T.C. 690, 717-718 (1958), affd. 295 F. 2d 336 (5th Cir. 1961). When respondent uses the bank deposits method to reconstruct income, his determination is presumed to be correct, and the taxpayer has the burden of proving that the deposits did not result from the receipt of taxable income. Mills v. Commissioner,399 F. 2d 744, 749 (4th Cir. 1968); Doll v. Glenn,231 F. 2d 186, 188 (6th Cir. 1956); Hague Estate v. Commissioner,132 F. 2d 775, 776 (2d Cir. 1943), cert. denied 318 U.S. 787 (1943); Estate of Mason v. Commissioner,supra,64 T.C. at 657; Rule 142(a), Tax Court Rules of Practice and Procedure. When, in such a case, the petitioner has the*283 burden of proof (i.e., a "straight" deficiency case) respondent is not required to prove a likely source of the unreported income. Armes v. Commissioner,448 F. 2d 972, 974-975 (5th Cir. 1971), revg. on other issues a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,supra,64 T.C. at 657. (See Part IV, infra, concerning this requirement with respect to respondent's use of the bank deposits method to show fraud.) With these principles in mind, we must now determine whether the numerous deposits to the Royal Bank and Bank of Nova Scotia during the years in issue constituted taxable income to petitioner for such years. Petitioner first attempts to demonstrate mathematically that his dental practice was incapable of generating a net profit sufficient to provide the requisite amount of cash needed to make the cash deposits during the years in issue. Proceeding with this argument, petitioner asserts that respondent's determination that the various deposits in issue represent unreported income thereby becomes arbitrary and capricious, shifting the burden of proof on this issue to respondent. This argument must fail, however, *284 for two separate reasons. First, such an argument is wholly dependent upon accepting petitioner's characterization of the notice of deficiency herein as being based on a determination that petitioner's dental practice represented the exclusive source of possible unreported income during the years in question. Such an interpretation is simply not required upon a fair reading of the record herein. The explanation of the proposed adjustments found in the notice of deficiency itself is silent on this point, stating only that certain amounts of the deposits to the Canadian banks during 1973, 1974, and 1975 represent unreported income, but without expressly designating an alleged source thereof. Nor does the answer filed by respondent herein serve to delimit the source of the alleged unreported income to petitioner's dental practice, a fair reading thereof indicating only that respondent alleges such income to have been derived from petitioner's "dental practice or other sources." We think respondent has cautiously avoided limiting the source of the unreported income to petitioner's dental practice. The main thrust of petitioner's argument on this point appears to be that respondent's*285 application of the self-employment tax provisions of sections 1401-1403 to the bank deposits determined to represent unreported income for taxable year 1973, coupled with respondent's application of the maximum tax provisions of section 1348 to compute the amount of the deficiencies arising in petitioner's 1973, 1974, and 1975 taxable years as a result of treating certain bank deposits during such years as unreported income, necessarily establishes that respondent's determination of a deficiency for those years is based on a determination that such unreported income derived solely from petitioner's dental practice. We disagree. Respondent's application of the self-employment tax provisions to the amount of unreported income determined to exist for taxable year 1973, in and of itself, establishes only that respondent determined such unreported income to be "self-employment income," i.e., gross income attributable to a trade or business carried on by petitioner. Secs. 1401(a), 1402(a), 1402(b). Similarly, utilization of the maximum tax provisions of section 1348 in computing the deficiencies alleged to exist in petitioner's 1973, 1974, and 1975 taxable years, in and of itself, establishes*286 only that respondent determined the amounts of unreported income alleged to exist in those years consisted of "earned income." While respondent's utilization of these provisions may indeed tend to suggest petitioner's dental practice as the most logical source of such unreported income, it does not follow that respondent has thereby necessarily limited his determination of unreported income to one which depends upon petitioner's dental practice as the sole source of such unreported income. Rather, we think respondent's application of the self-employment tax and maximum tax provisions to the amounts of unreported income determined to exist therein at most represents merely a suggestion by respondent of a likely source of such unreported income. Respondent need not suggest a likely source of the unreported income with respect to the deficiency portion of this proceeding. Armes v. Commissioner,supra;Estate of Mason v. Commissioner,supra.(See Part IV, infra, concerning respondent's use of the bank deposits method to sustain a claim of fraud.) However, even assuming petitioner's interpretation of respondent's position herein to be correct, *287 and even assuming respondent had restricted his determination to one which rests solely on petitioner's dental practice as the source of the unreported income, petitioner's attempt to demonstrate mathematically that his dental practice was incapable of producing a sufficient profit to fund the deposits in issue still possesses serious shortcomings with respect to most of the deposits in issue. 64 Basically speaking, petitioner utilizes an "average profit per patient" figure that he derived by dividing the net profit figure from his dental practice as shown on his 1973, 1974, and 1975 returns by the total number of patients petitioner's records indicate he saw for such years. Based on that, petitioner argues that his dental practice could not possibly have accommodated the number of additional patients required to generate the amount of cash deposited to the Canadian banks during such years. However, petitioner's argument on this point is fatally flawed in that it ultimately rests on the correctness of the very documents called into question herein--petitioner's records and returns for the years at issue. Those books and records and tax returns have had a serious shadow of doubt*288 cast upon them by the evidence of record. The number of patients petitioner claims he saw during the years at issue has been directly contradicted by the testimony of Dr. Buckis, a dentist associated with petitioner's dental practice for a period of time spanning 1973 and 1974, who indicated a much higher figure for the average number of patients seen per day. Further, petitioner at one time intimated to Dr. Buckis that he was not reporting all of his income from the dental practice and that he (Dr. Buckis) need not report all of his income from that practice. We found Dr. Buckis to be a credible witness. Petitioner has failed to introduce any evidence to corroborate his lower estimate as to the average number of patients per day other than his own self-serving testimony. Although petitioner claimed that laboratory invoices from the manufacturers of the dentures he fitted were available and would have corroborated his claim as to the number of patients seen, no such invoices were produced. 65*289 With respect to the accuracy of the net profit as indicated by petitioner's returns for the years in issue and the records upon which such returns are based, there are several suspicious circumstances surrounding the preparation of such records and returns which adversely impact upon their accuracy.The patient cards that formed the central feature of the fairly rudimentary record-keeping system utilized in petitioner's dental practice, apparently constituting the primary source of information as to the billings and receipts thereof, lacked a sequential numbering system. Therefore, it could not be verified whether all of such cards and the information thereon made their way into the year-end summaries prepared by Ms. Shenk. The record does not indicate that any other records which could be used to verify that all receipts were included in the year-end totals, such as a daily receipts ledger, was maintained at any time. Petitioner's extensive involvement in the preparation of the year-end summaries also arouses suspicion, as it presents an obvious opportunity for potential abuse. When the year-end summaries were given to petitioner's accountants to prepare his returns therefrom, *290 such summaries were curiously lacking in any information as to the amount of receipts from petitioner's dental practice for taxable years 1974 and 1975, and contained only quarterly summaries of the alleged net profit from the dental practice for taxable year 1973, without providing any corroboration thereof or breakdown of the component receipts entering into such net income figures. In short, the evidence of record fails to corroborate the accuracy of petitioner's records and returns as to either the number of patients seen or the net profits from the dental practice during the years in issue. Therefore, petitioner's argument on this point must fail. In this regard, we have considered the parties' stipulation that petitioner's records of income and expenses for his 1973, 1974, and 1975 taxable years reconcile to his returns for those years, a point heavily relied upon by petitioner. However, as noted earlier herein, that fact proves nothing more than such records and returns are consistent with each other, and does not establish their truth or accuracy. Davis v. Commissioner,supra.See Holland v. United States, supra.In the alternative, *291 petitioner also attempts to explain the source of the various deposits in question, breaking such deposits down into two separate groups: the Lucas deposits and the remaining deposits. For convenience, we also separate these deposits into two groups and discuss them separately below. A. The Lucas DepositsWith respect to the Lucas deposits, petitioner contends that the money deposited represents the proceeds of several loans from the mysterious Mr. A. W. Lucas. This is a fictitious name for a wealthy Chilean refugee petitioner allegedly met and befriended during a fishing trip to Canada. We have taken care in our findings of fact to set out in detail and length petitioner's alleged transactions with Lucas. The circumstances of petitioner's alleged initial meeting with Lucas, the full details of which petitioner kept secret until his testimony at trial, as well as his alleged subsequent relationship with Lucas, can only be described as incredible. The general incredibility of petitioner's tale as to the source of the Lucas deposits is further fueled by the numerous contradictions, inconsistencies, and implausible explanations in petitioner's various recitations of the*292 details of this relationship to the Canadian revenue agents, to the IRS agents, and to this Court. The revised versions at the trial also involved several attempts by petitioner to alter or contradict the stipulation of facts executed by the parties. A reading of the record shows that petitioner changed his story from time to time and often shaped the details of a particular recitation of his alleged relationship with Lucas to try to satisfy the particular audience hearing the story. We think no useful purpose would be accomplished here by repeating the numerous contradictions, inconsistencies and implausibilities apparent from the various recitations of the Lucas transactions advanced by petitioner and set out in our findings of fact. The combined effect of these numerous contradictions, inconsistencies and implausibilities casts grave doubt on petitioner's veracity and his explanation of the alleged source of the Lucas deposits. We accordingly reject such explanation. Suffice it to say, we simply do not believe petitioner. Indeed, based on the evidence of record we do not believe that the man referred to as Lucas actually existed, much less that he was the source of the money*293 petitioner used to make what has been referred to herein as the Lucas deposits. Petitioner has steadfastly refused to arrange a meeting between Lucas and the agents of both Revenue Canada and the IRS who have been involved in the investigations of petitioner's tax liabilities for the years at issue. It appears from the record that petitioner has never claimed that he did not know how to contact Lucas. While three witnesses testified at trial that petitioner had introduced them to a man he identified as Lucas, such testimony establishes nothing more than that such introductions occurred. It does not establish that the man actually was Lucas, as it is clear from the record that none of these witnesses had any independent knowledge regarding the man's identity and were relying exclusively on what petitioner told them. The description of the man given by each of the three witnesses generally matched, but that fact at most proves that they each met the same man. It does nothing to prove the man's identity as that of Lucas. We think it important to note also that all three witnesses met "Lucas" in the latter part of 1976 or thereafter. This was subsequent to the time of the seizure*294 of petitioner's personal Canadian bank accounts in payment of unpaid Canadian income taxes and after the monies on deposit in the Canadian banks had been withdrawn therefrom in the form of bank drafts payable to Lucas and returned to Stanley, Virginia. There is a singular absence of any evidence which can affirmatively identify the man these three witnesses met as Lucas, other than petitioner's wholly uncorroborated, self-serving statements. Moreover, all of the documents introduced into evidence ostensibly bearing Lucas' signature were actually signed by petitioner's girlfriend, Ms. McGuire, at petitioner's request. Finally, the address and Social Security number utilized by petitioner to open the Lucas savings account at the Stanley bank were also false. The objective evidence of record strongly suggests that Lucas did not in fact exist. As against this objective evidence, there was only petitioner's wholly uncorroborated, self-serving testimony which we did not find to be credible. According to petitioner, respondent offered little evidence to contradict petitioner's recitation of the alleged details of his relationship with Lucas. That is hardly astonishing considering*295 petitioner furnished the complete details of that alleged relationship for the first time at the trial, allegedly on the advice of his counsel, the night before the trial, to tell all. However, respondent presented ample evidence of the various conflicting statements petitioner had earlier made to agents of Revenue Canada and to agents of the IRS. Moreover, even if petitioner's testimony had been uncontradicted (and it was not), that would provide no support for petitioner's position. We are not required to accept testimony as gospel, even though it is not controverted; we are entitled to take into account whether it is improbable, unreasonable, or questionable. Quock Ting v. United States,140 U.S. 417, 420-421 (1891); Lovell and Hart, Inc. v. Commissioner,456 F. 2d 145, 148 (6th Cir. 1972); Ruark v. Commissioner,449 F. 2d 311, 312 (9th Cir. 1971); Fleischer v. Commissioner,403 F. 2d 403, 406 (2d Cir. 1968); Glimco v. Commissioner,397 F. 2d 537, 540-541 (7th Cir. 1968), affg. a Memorandum Opinion of this Court; Kean v. Commissioner,51 T.C. 337, 343-344 (1968), affd. on this*296 point 469 F. 2d 1183, 1188 (9th Cir. 1972). In light of the nature of petitioner's "evidence" pertaining to the Lucas relationship, consisting entirely of petitioner's self-serving and uncorroborated testimony, we do not find the lack of evidence introduced by respondent to contradict certain portions of petitioner's testimony surprising. In reaching our conclusion as to the Lucas deposits, we attach little weight to petitioner's claim that the monies were returned to Lucas in December of 1976. Petitioner's story about returning the money is supported only by his mother's testimony. While the story by mother and son was more or less consistent, the Court did not find either to be a credible witness. Even assuming the nursing home scenario did occur, and we doubt that it did, 66 such a fact would be of no benefit to petitioner. There is still no evidence of record other than petitioner's own self-serving and uncorroborated statement that the man allegedly introduced to his mother as Lucas was in fact Lucas, rather than merely petitioner's accomplice in an effort to manufacture evidence as to Lucas' existence and alleged receipt of the 6,700 $100 bills. *297 Similarly, the fact that respondent has been unable to trace the money to petitioner or members of his family since the alleged return thereof to Lucas does not establish that petitioner has not in fact subsequently received such money. Furthermore, in view of the evidence of record which suggests that petitioner travelled extensively both before, during, and after the years in issue, we find respondent's explanation of his inability to trace those $100 bills reasonable. Viewing the record in its entirety, we flatly reject petitioner's claim that the funds used to make the Lucas deposits represented the proceeds of various loans from Lucas. Rather, we think the only logical conclusion to be drawn from the record as a whole is that Lucas was merely a creature born of petitioner's continuing attempts to conceal his ownership of the funds used to make the Lucas deposits which were then subsequently transferred to the Lucas savings account. Accordingly, respondent's determination that the amounts referred to herein as the Lucas deposits represent unreported income for the years 1973, 1974, and 1975 is sustained. B. The Remaining DepositsWith regard to the remaining deposite*298 which respondent has determined represent unreported income during the years in issue, petitioner attempts to trace the funds used to make those deposits to various pre-existing sources. Those alleged sources include various CD's allegedly owned by petitioner's children or his mother, Mrs. Remilli; passbook savings accounts maintained at the Luray Bank, some owned by petitioner and some allegedly owned by petitioner's children; sale proceeds from a camper owned by petitioner; payments received for damages to personal property owned by petitioner; and miscellaneous cash provided by petitioner and Mrs. Remilli. Petitioner's position is that as the funds used to make the amounts of the remaining deposits derived from pre-existing and previously taxed funds, such amounts do not represent unreported income for the years in issue as determined by respondent. We must reject petitioner's claim since he has failed to demonstrate that any of the alleged sources for these deposits actually formed a part of such deposits. With regard to the two separate groups of CD's which petitioner contends formed part of the deposits to the Royal Bank on September 11, 1973 and August 12, 1974, respectively, *299 petitioner has offered only his self-serving and uncorroborated testimony in support of his claim that any part of the redemption proceeds from these various CD's made up any portion of such deposits. Indeed, petitioner's testimony itself is based only on the alleged coincidence of the July 13, 1973 and June 20, 1974 redemption dates of the two groups of CD's to the deposit dates of September 11, 1973 and August 12, 1974, respectively. We agree with respondent that the alleged coincidence of the respective redemption dates and deposit dates is simply too tenuous to utilize as a basis for tracing the source of a particular deposit. There is a lapse in both cases of more than two months between the redemption date of a particular group of CD's and the date of the subsequent deposit such proceeds allegedly formed a part of. Petitioner is unable to explain this delay except in the most general and unconvincing terms. Further, it is clear from the record that petitioner could not, without reliance upon the alleged coincidence of the redemption dates and deposit dates, affirmatively testify of his own knowledge that any particular CD or group of CD's formed a part of either the September 11, 1973 or*300 August 12, 1974 deposit, respectively. Petitioner indicated at trial that a portion of the redemption proceeds from certain of the CD's owned by Mrs. Remilli may have been used to purchase CD's from Canadian banks in her name. Finally, at trial petitioner repeatedly referred to records he said he had which would independently verify that the majority of the funds forming the September 11, 1973 and August 12, 1974 deposits to the Royal Bank were traceable to the redemption proceeds of the various CD's as claimed by petitioner. However, petitioner failed to produce such records. In this circumstance, we think it is proper to infer from petitioner's failure to produce such records that they would have been harmful to his position on this point if produced. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (10th Cir. 1947). Accordingly, petitioner has failed to prove that any portion of either the September 11, 1973 or August 12, 1974 deposits to the Royal Bank is attributable to CD's previously owned by petitioner's children or by Mrs. Remilli. Petitioner has similarly failed to prove that any portion of*301 the September 11, 1973 deposit to the Royal Bank is attributable to funds withdrawn from passbook savings accounts maintained in his or his children's names at the Luray Bank. Petitioner's testimony on this point is vague, self-serving and uncorroborated. He is again primarily relying on the alleged coincidence of certain withdrawal dates from the savings accounts to the September 11, 1973 deposit date as the basis for his claim that a portion of such deposit is traceable to the savings account. However, this argument must again fail. The various passbook savings accounts indicate withdrawals from only two of the five separate savings accounts in any amount within a reasonable proximity of the September 11, 1973 deposit date, and such withdrawals as did occur were made over a period ranging from two to almost five months before the September 11, 1973 deposit date. Petitioner has offered no explanation for this delay. Thus, the alleged coincidence of the withdrawal dates and the September 11, 1973 deposit date is again too tenuous to support petitioner's claim that withdrawals in any amount from the passbook savings accounts formed a part of the September 11, 1973 deposit. Further, *302 petitioner has once again referred to records which would verify his claim on this point but has failed to produce such records. An adverse inference once again arises from petitioner's failure to produce such records. Wichita Terminal Elevator Co. v. Commissioner,supra.Accordingly, petitioner has failed to prove that any portion of the September 11, 1973 deposit to the Royal Bank was attributable to funds withdrawn from the passbook savings accounts maintained at the Luray Bank. We must also reject petitioner's claim that approximately $1,600 to $1,700 of the August 12, 1974 deposit to the Royal Bank represented the proceeds from the sale by petitioner of a camper attachment for a pickup truck during 1974. While petitioner has introduced documentary proof concerning his purchase of the camper during 1974, he has offered no evidence other than his vague, uncorroborated, and self-serving testimony to indicate that this camper was then subsequently sold during the same year. Again we attach no weight to his testimony due to his general lack of credibility as a witness. Accordingly, petitioner has failed to prove that any portion of the August 12, 1974 deposit*303 to the Royal Bank was derived from sale proceeds of a camper attachment. Petitioner's claim that a portion of the November 10, 1975 deposit to the Royal Bank represented payment of overdue mortgage installments from the sale of the Canadian residence and payment for damages to certain personal property stored therein must be rejected for the same reasons. Petitioner's only evidence as to the source of the amount of this deposit remaining in issue was his self-serving and uncorroborated testimony, which we again reject due to petitioner's general lack of credibility as a witness. In addition, the only documentary evidence of record pertaining to this alleged transaction, consisting of the amendment to the mortgage indenture dated December 23, 1975, suggests that any such payment by Mr. Brown, if actually made, did not occur until over one month after the deposit on November 10, 1975. Accordingly, petitioner has failed to prove that any portion of the November 10, 1975 deposit to the Royal Bank represented overdue mortgage installments or payments for damages to personal property. Finally, we must reject petitioner's general contention that any portion of the deposits to the Royal*304 Bank on September 11, 1973, August 12, 1974, September 9, 1974, or November 10, 1975, respectively, represented contributions by petitioner or by Mrs. Remilli of previously taxed miscellaneous funds. Again petitioner has offered no evidence in support of this position other than his self-serving and uncorroborated testimony, and we again reject such testimony due to petitioner's general lack of credibility as a witness. In conclusion on this point, petitioner has failed to demonstrate that any of the funds used to make the remaining deposits at issue herein 67 were attributable to the nontaxable sources indicated. Respondent's determination that such amounts represent unreported taxable income to petitioner is accordingly sustained. II. Taxability of the Interest Earned on the Canadian Bank Accounts During 1973, 1974, 1975, and 1976 and on the Lucas Savings*305 Account in 1976In his notice of deficiency, respondent has determined that petitioner is taxable on the amounts of interest income earned on the Canadian bank deposits in taxable years 1973, 1974, 1975, and 1976, respectively, as well as the interest income earned on the Lucas savings account in taxable year 1976. In his petition filed herein, petitioner has conceded that he is taxable on substantial amounts of the interest income generated by the Canadian bank deposits in taxable years 1973, 1974, 1975, and 1976. Further, in granting respondent's motion for partial summary judgment on October 20, 1982, which will be discussed below, this Court held petitioner to be collaterally estopped from denying that he received substantial amounts of interest income on his Canadian bank accounts in taxable year 1975. At trial and on brief, petitioner has taken the position that the taxability of the interest earned by the various deposits during the years in issue turns upon whether petitioner was the owner of the funds of the accounts into which they were deposited. Accordingly, since we have concluded that petitioner was the owner of the funds deposited into the Lucas accounts, he*306 is taxable on the interest earned thereon during the years in issue. We think this result must also follow as to the interest earned on the remaining deposits in the Canadian banks during the years in issue since petitioner has failed to demonstrate he was not the true owner of such funds. Petitioner is taxable on the interest income even though the parties have stipulated as to the source of some portions of the funds entering into such deposits. 68 Petitioner has failed to overcome the evidence of record which shows that his dominion and control over the various Canadian bank accounts was unfettered, thereby negating any claim that the accounts themselves belonged to petitioner's children. Cf. Corliss v. Bowers,281 U.S. 376, 378 (1930). Finally, with respect to the Lucas savings account, the evidence of record also establishes petitioner's ownership of such account and the funds deposited therein, the account being opened in Lucas' name in furtherance of petitioner's attempts to conceal his ownership of such funds. Accordingly, we sustain respondent's determination that petitioner had unreported interest income during the taxable years in issue in the amounts*307 set forth in the notice of deficiency. III. Gain from Involuntary ConversionRespondent determined in his notice of deficiency that petitioner was taxable upon the fire insurance proceeds received with respect to the dwelling fire at Toothacres. Petitioner asserts that such*308 proceeds are taxable to his children, contending that they became the owners of Toothacres pursuant to the deed executed on January 3, 1974, purportedly conveying title thereto to the children. Respondent contends that there was never an effective conveyance of Toothacres to petitioner's children. Specifically, the parties' disagreement on this point centers upon whether there has been an effective delivery of the deed so as to pass title to petitioner's children. To resolve this dispute, we must turn to an examination of Virginia real property law. Under Virginia law, delivery is essential if a deed is to pass title. Capozzella v. Capozzella,213 Va. 820, 196 S.E. 2d 67 (1973); Brewer v. Brewer,199 Va. 753, 102 S.E. 2d 303 (1958); Enright v. Bannister,195 Va. 76, 77 S.E. 2d 377 (1953). Although delivery is required, there are many methods by which it may be accomplished. "The delivery may be actual, as by manual tradition to the grantee, or to another for his use, or it may be constructive, as where it is placed in the power and control of the grantee. [Delivery] may be proved by direct evidence or inferred from the circumstances.*309 " Enright v. Bannister,supra,195 Va. 76, 77 S.E. 2d at 379. Under Virginia law, it is also clear that the grantor's intent is the primary factor involved in determining whether a particular set of facts and circumstances constitutes a "delivery." "There was a delivery if there was the intention to deliver which is effectuated by words or acts, and this is a question of fact to be gathered from all the circumstances of the particular case." Payne v. Payne,128 Va. 33, 104 S.E. 712, 716 (1920). "Intent governs delivery." Parks v. Parks,181 Va. 126, 23 S.E. 2d 792, 796 (1943); Garrett v. Andis,159 Va. 150, 165 S.E. 657, 659 (1932). "What makes delivery operative is the grantor's intent." Capozzella v. Capozzella,supra,213 Va. 820, 196 S.E. 2d at 70. "The giving of the [deed] by the grantor and the receipt thereof by the grantee with mutual intent to pass title and ownership from the former to the latter is absolutely necessary to impart to it life and vitality." Crump v. Gilliam,190 Va. 935, 59 S.E. 2d 72, 74 (1950); cf. Leftwich v. Early,115 Va. 323, 79 S.E. 384 (1913).*310 In determining whether delivery has occurred under Virginia law, "[i]t is generally agreed * * * that the law makes stronger presumptions in favor of delivery where a deed is a voluntary settlement than in an ordinary case of bargain and sale." Enright v. Bannister,supra,195 Va. 76, 77 S.E. 2d at 380. However, even in such cases some evidence of delivery must still be present. Garrett v. Andis,supra,159 Va. 150, 165 S.E. at 659. Further, in cases of voluntary settlement, "* * * the fact that the grantor stands in the relation of * * * parent to the grantee, and has made statements to the effect that he intended to, and did, execute such a deed * * *" is viewed as a "potent factor" whether there has been a delivery of such deed. Brewer v. Brewer,supra,199 Va. 753, 102 S.E. 2d at 312."The acknowledgement of a deed is a circumstance tending to show delivery, but standing alone it is insufficient to make a prima facie case of delivery." Enright v. Bannister,supra,195 Va. 76, 77 S.E. 2d at 380. If delivery is made, recordination is not necessary to pass title. Capozzella v. Capozzella,supra,213 Va. 820, 196 S.E. 2d at 70.*311 In light of the above principles and based upon the record in this case, we can only conclude that petitioner has not carried his burden of proving there was a delivery of the deed purportedly conveying the farm, Toothacres, to petitioner's children. The evidence offered in support of petitioner's claim on this point consisted primarily of his own self-serving and uncorroborated testimony, and we have heretofore indicated that we found petitioner lacking in credibility as a witness. Furthermore, although petitioner asserted at trial that his children would have readily testified and corroborated his testimony in this regard if he had only asked them to, none of petitioner's children testified. At the time of the trial the children were all adults, aged 19 through 27. We can justly infer from petitioner's failure to call them to testify that such testimony, if adduced, would have been adverse to petitioner's claims. Wichita Terminal Elevator Co. v. Commissioner,supra.The only other evidence introduced by the parties on this point concerns the subsequent treatment of Toothacres by petitioner and his children after the alleged transfer--i.e., how the property*312 was listed for local property tax purposes and who paid such taxes, whether petitioner continued to live at Toothacres and whether petitioner showed the original deed to Agent Weaver subsequent to its alleged delivery to the children. Such evidence is ambiguous at best, providing little, if any, support for petitioner's position, if indeed such facts do not weigh against him. There is simply no credible evidence of record to support petitioner's claim that he in any manner "delivered" the deed to Toothacres to his children. In reaching this conclusion, we have considered the fact that this appears to be a voluntary settlement case in which the putative grantor is a parent of the putative grantees. However, we think that such factors, even though favorably viewed by Virginia law, Enright v. Bannister,supra;Brewer v. Brewer,supra, are negated by the complete absence of any other credible evidence in the record clearly indicating that the deed was in any manner delivered to petitioner's children, cf. Garrett v. Andis,supra,159 Va. 150, 165 S.E. at 659, coupled with the adverse inference to be drawn from the failure*313 of petitioner's children to testify. Wichita Terminal Elevator Co. v. Commissioner,supra.We must also reject petitioner's argument that his alleged intent to convey Toothacres to his children, standing alone, is sufficient to establish delivery under Virginia law. We think petitioner's argument misinterprets the function of the putative grantor's intent in this regard. As we read the relevant cases, the grantor's intent does not act as a substitute for delivery of a deed. Rather, given the myriad number of means by which a delivery may be accomplished under Virginia law and the sometimes difficult application of the established legal principles thereto, cf. Payne v. Payne,supra,128 Va. 33, 104 S.E. at 716, we think the grantor's intent, instead, serves as the primary guide in determining whether a particular set of facts and circumstances alleged to constitute a delivery in fact does so. The grantor's intent to deliver a deed and pass title thereby must still be "* * * effectuated by words or acts * * * *" Payne v. Payne,supra,128 Va. 33, 104 S.E. at 716. Cf. Leftwich v. Early,supra.*314 Furthermore, even if the grantor's intent alone could suffice, we note that petitioner's intent with respect to the putative transfer of Toothacres is far from clear. In particular, although petitioner indicated at trial his alleged desire to transfer Toothacres to his children as a result of his marital problems and also in hopes of protecting the property from claims by his potential malpractice judgment creditors, he also testified that his "advice" to his two eldest children concerning the recording of the deed emanated from his desire to protect the property from being subjected to potential judgment creditors of his children and also to prevent the children from seeking a partition of the property in the event dissension arose among them. In light of such testimony, we think the existence of the requisite intent by petitioner to pass fee simple title to his children by the alleged delivery of the deed is far from certain. Petitioner having failed to carry his burden of proving that there was a delivery of the deed in question so as to effectuate a transfer of title of Toothacres to his children, petitioner is therefore taxable on the insurance proceeds received with respect*315 to the dwelling fire at Toothacres. Accordingly, we must also determine petitioner's basis in the dwelling in order to determine the amount of gain, if any, realized from his receipt of such insurance proceeds. Petitioner has offered no evidence in support of his claimed basis in the dwelling other than his uncorroborated and self-serving estimate as to the cost of constructing the dwelling. He has offered no evidence indicating his qualifications to make such estimate. There being no probative evidence in the record from which we can approximate petitioner's basis in the dwelling, see Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), we affirm respondent's determination that the full amount of the $17,000 insurance proceeds represented taxable income to petitioner. Accordingly, respondent's determination that petitioner realized a long-term capital gain in taxable year 1974 in the amount of $9,576.64 from the involuntary conversion of the dwelling at Toothacres is sustained. 69IV. Additions to Tax for Fraud: Section 6653(b)In his statutory notice of deficiency, respondent determined petitioner was liable for the fraud*316 addition in each of his 1973, 1974, 1975, and 1976 taxable years in the amounts of $132,298.29, $29,607.83, $13,738.28, and $12,021.23, respectively. Section 6653(b)(1) provides, in part, that "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Respondent has the burden to establish fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F. 2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct*317 calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States,supra,398 F. 2d at 1004; Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stone v. Commissioner,56 T.C. 213, 223-224 (1971);*318 Otsuki v. Commissioner,supra,53 T.C. at 105-106. Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F. 2d 216, 220 (6th Cir. 1955). Under section 6653(b), the fraud addition attaches to the entire deficiency even though only a portion of the underpayment is due to fraud. Mensik v. Commissioner,supra,328 F. 2d at 150; Johnson v. United States,94 Ct. Cl. 345, 39 F. Supp. 103 (1941). See also Breman v. Commissioner,66 T.C. 61 (1976); Stewart v. Commissioner,66 T.C. 54 (1976). Absent an underpayment, there is nothing to which the fraud addition may attach. Sec. 6653(b). See Jenkins v. United States,313 F. 2d 624, 627 (5th Cir. 1963). Consequently, the existence of an underpayment is an element of the fraud that respondent must establish. See Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Stone v. Commissioner,supra,56 T.C. at 220. Although respondent need not prove the precise amount of the underpayment of tax, nonetheless, he still must prove that the taxpayer has, *319 to some extent, underpaid his taxes. Otsuki v. Commissioner,supra,53 T.C. at 105. In a case such as this where the allegations of fraud for certain years are intertwined with the alleged omission of income resulting from respondent's use of an indirect method to recompute a taxpayer's income for those years, we must be extremely careful so that we do not bootstrap the finding of an underpayment requisite to a further finding of fraud upon a taxpayer's failure to carry his burden of proof with respect to the underlying deficiency for such years. See Drieborg v. Commissioner,supra,225 F. 2d at 218; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,supra,53 T.C. at 106. See also George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F. 2d 900 (6th Cir. 1944). A taxpayer's failure to satisfy his burden of proof as to the deficiencies determined by respondent does not constitute proof of fraud. George v. Commissioner,supra,338 F. 2d at 223;*320 Pigman v. Commissioner,31 T.C. 356, 370 (1958). Where respondent relies upon the bank deposits method to establish an underpayment of tax as required by section 6653(b) respondent must, in order to meet his burden of proof on this issue, introduce evidence that the unexplained bank deposits were derived from currently taxable income which petitioner fraudulently omitted from his tax return. See Drinkhouse v. Commissioner,225 F. 2d 874 (2d Cir. 1955), affg. a Memorandum Opinion of this Court. The necessary proof may come from evidence which either affirmatively shows a "likely" taxable source for the deposits, or which negates nontaxable sources therefor, thereby eliminating the need for proof of a likely source. See Holland v. United States,supra;United States v. Massei,355 U.S. 595 (1958); Armes v. United States,supra, 448 F. 2d at 974-975. 70Respondent can demonstrate the existence of a likely source by proving a disclosed*321 business of the taxpayer to be capable of producing much more income than was reported. Holland v. United States,supra.See also Gleckman v. United States,80 F. 2d 394, 399 (8th Cir. 1935). Furthermore, with regard to negating nontaxable sources for the bank deposits in question, it has long been established that where the taxpayer has suggested a single nontaxable source respondent need only negate that specific source and need not negate other possible sources of nontaxable income which have, in effect, been negated by the taxpayer's claim of a specific source. Kramer v. Commissioner,389 F. 2d 236, 239 (7th Cir. 1968); Gatling v. Commissioner,286 F. 2d 139, 144 (4th Cir. 1961); Commissioner v. Thomas,261 F. 2d 643, 646 (1st Cir. 1958). Applying the above principles to the facts of this case, we think respondent has clearly carried his burden of demonstrating by clear and convincing evidence the existence of an underpayment in each of petitioner's taxable years in issue. With respect to taxable years 1973 and 1974, while we are not certain respondent has established petitioner's dental*322 practice as a "likely source" for all of the deposits during such years, we do think respondent has established such dental practice as a likely source of certain of such deposits. 71 By the testimony of Dr. Buckis, a dentist who was associated with petitioner's dental practice for a period of time covering portions of both 1973 and 1974 and whom we find to be a credible witness, respondent has established that petitioner's dental practice was capable of producing much more income than was reported. Holland v. United States,supra;Gleckman v. United States,supra.Thus, respondent has established petitioner's dental practice as a likely source for the various deposits in issue. Furthermore, even assuming respondent could not establish petitioner's dental practice as a likely source for certain of the deposits in issue, he has, at least with respect to that group of deposits which we have referred to herein as the Lucas deposits, carried his burden of proof as to the existence of an underpayment in taxable years 1973 and 1974 by the alternative method of negating petitioner's claims as to the specific source for those deposits, thereby eliminating*323 the need of proving a likely source therefor. United States v. Massei,supra.In any event, respondent's ability to satisfy his burden of proof as to the existence of an underpayment during each of the years in issue is not solely dependent upon the results of respondent's application of the bank deposits method to reconstruct petitioner's taxable income for certain of those years. In his pleadings herein, petitioner has expressly conceded that he omitted from his taxable income during each of the years in issue substantial amounts of interest income earned on the Canadian bank deposits. Furthermore, with respect to taxable year 1975, petitioner has heretofore been adjudged to be collaterally estopped from denying that he improperly omitted from his return for that year substantial amounts of interest income earned by the Canadian bank deposits during 1975. We are satisfied from the record as a whole that respondent has convincingly established substantial amounts of unreported income and a resulting underpayment of tax for each of the taxable years in issue. Before turning to the issue of petitioner's fraudulent intent, we*324 must first address the matter of our previous order granting respondent's motion for partial summary judgment as to petitioner's liability for the fraud addition for taxable year 1975. That order was based upon petitioner's prior conviction of willfully filing a false income tax return for taxable year 1975 in violation of section 7206(1). In our recent Court reviewed opinion of Wright v. Commissioner,84 T.C. 636 (1985) we expressly overruled our earlier decisions in Goodwin v. Commissioner,73 T.C. 215 (1979) and Coinsidine v. Commissioner,68 T.C. 52 (1977) to the extent that such cases had held that a taxpayer convicted of willfully filing a false return under section 7206(1) was thereby collaterally estopped from denying his liability for the section 6653(b) fraud addition in a civil tax proceeding pertaining to the same taxable year. In view of our decision in Wright v. Commissioner,supra, we do not think our earlier order granting respondent's motion for partial summary judgment can stand. Accordingly, on our own motion we consider it proper to vacate such earlier order to the extent it held petitioner*325 collaterally estopped as to the fraud addition for taxable year 1975. Mindful that respondent has the burden of proof on this matter and that at trial respondent was entitled to rely upon our ruling, we will nevertheless decide this issue on the merits based on the record of the case before us. There are numerous indicia of fraud in the record before us which lead us to sustain respondent's determination that some portion of the underpayment in tax in each year in issue is due to fraud within the meaning of section 6653(b). Petitioner has failed to report a substantial amount of income in each of the years in issue.Such a consistent pattern of underreporting substantial amounts of income over a period of several years, standing alone, is strong evidence of an intent to evade taxes. Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962); Cefalu v. Commissioner,276 F. 2d 122, 129 (5th Cir. 1960); Brooks v. Commissioner,82 T.C. 413, 431 (1984); Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). From the samples thereof introduced into evidence, we think that petitioner's records may fairly be characterized*326 as inadequate. A taxpayer's failure to keep adequate books and records also indicates fraud. Otsuki v. Commissioner,supra,53 T.C. at 109-110; Safra v. Commissioner,30 T.C. 1026, 1036 (1958); Arlette Coat Co. v. Commissioner,14 T.C. 751, 756 (1950). The patient cards which were the only original record of income from petitioner's dental practice were not sequentially numbered. The year-end summaries of income could not be verified. Petitioner also dealt extensively in cash, a factor which both indicates fraud and also heightens the effect of inadequate record keeping. Friedman v. Commissioner,421 F. 2d 658 (6th Cir. 1970); affg. a Memorandum Opinion of this Court; Gromacki v. Commissioner,361 F. 2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Nicholas v. Commissioner,70 T.C. 1057, 1066 (1978). Petitioner also used false and fictitious names and addresses to conceal the ownership of the bank accounts in question. Petitioner also made various false and misleading statements to both the Canadian revenue agents and respondent's agents during the course*327 of their investigation. These factors constitute further indicia of fraud. Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Gromacki v. Commissioner,supra;Furnish v. Commissioner,262 F. 2d 727, 729 (9th Cir. 1958); Smith v. Commissioner,32 T.C. 985, 987 (1959). Furthermore, petitioner failed to cooperate fully with respondent's agents investigating his tax liabilities for the taxable years at issue. He concealed certain "facts" about his alleged relationship with Lucas until the very day of the trial of the case. Such failure to cooperate constitutes a further indicium of fraudulent intent. Millikin v. Commissioner,298 F 2d 830, 836 (4th Cir. 1962); Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Estate of Beck v. Commissioner,supra,56 T.C. at 363. Finally, with respect to taxable year 1975, although petitioner's conviction under section 7206(1) for that year does not conclusively establish his liability for the fraud addition*328 for that year, Wright v. Commissioner,supra, such conviction does collaterally estop petitioner from denying that he willfully and knowingly filed a false income tax return for taxable year 1975 by reason of omitting therefrom a substantial amount of interest income earned on the Canadian bank deposits during that year. Such facts remain relevant to the determination of petitioner's liability for fraud as to taxable year 1975, providing further evidence of fraud. Wright v. Commissioner,supra,84 T.C. at 643. In sum, respondent has carried his burden of proof as to fraud for each of the taxable years in issue. To reflect the concessions of the parties and the foregoing, Decision will be entered under Rule 155.Footnotes1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the yrars in issue.↩2. The record is not clear as to whether Dr. Buckis was already in the employ of petitioner and merely maintained the practice during petitioner's suspension, or whether Dr. Buckis instead leased the practice from petitioner during such period. At some point Dr. Buckis was paid $3,000 a month by petitioner, and at another point Dr. Buckis paid petitioner $2,000 a month under some kind of lease agreement.↩3. The adding machine tapes were usually presented to Ms. Shenk by petitioner, but Ms. Shenk may have prepared a few of them.↩4. The return indicates that Mares was employed by Robert M. Musselman, one of petitioner's counsel of record herein. ↩5. The record does not indicate that such an amended return was ever filed.↩6. The parties have stipulated and petitioner's passport indicates that from 1967 through 1972 petitioner also made several trips to Peru, and there are vague references in the evidence presented herein concerning farm property located in Peru that petitioner may have owned during the years in question. ↩7. Contrary to the stipulation of facts, at trial petitioner denied making the April 11, 1973 and April 29, 1974 deposits, asserting such deposits were instead made by the mysterious Mr. A.W. Lucas, who will be discussed in greater detail herein, infra. We reject petitioner's attempt to alter the atipulation of facts as executed by the parties. See Rule 91(e), Tax Court Rules of Practice and Procedure.↩ Moreover, we have so little confidence in petitioner's veracity that we would not relieve him of the stipulation merely on his own self-serving, uncorroborated testimony at the trial. 8. In addition to the above specified deposits, petitioner also made the following deposits to two separate accounts in his name at the Bank of Nova Scotia: DateAmount10-31-74$21,631.9806-10-75114,301.14These deposits consisted entirely of interest generated by the earlier deposits listed above or represented transfers of portions of the principal amounts deposited on such dates to newly opened accounts. As such, respondent does not contend herein that such deposits represent additional "original" income to petitioner and has not included such deposits in his reconstruction of petitioner's income by the bank deposits method. Of course, respondent still treats that portion of these later deposits consisting of interest earned on the earlier deposits as taxable income to petitioner in the year(s) such interest accrued. We note that the total amount of the June 10, 1975 deposit, $114,301.14, exceeds by $3,723.92 the sum of the component parts of such deposit listed in a ledger sheet detailing the transactions with the Bank of Nova Scotia which the parties have submitted as a joint exhibit herein, and the parties have provided no explanation for this apparent discrepancy. As several of the other joint exhibits submitted by the parties appear to depend upon and acept as correct the aggregate figure given for the $114,301.14 deposit, we will do likewise.↩9. On July 24, 1973, petitioner formally entered Canada as a landed immigrant. Landed immigrant status is not necessarily a preliminary step to obtaining Canadian citizenship but enables a person to live and work in Canada. Both the Canadian immigration record of petitioner's entry submitted as a joint exhibit herein and the stipulation of facts executed by the parties indicate that petitioner had $35,000 in U.S. currency in his possession at the time of such entry. Not only does petitioner deny that this money was the source of the September 11, 1973 deposit to the Royal Bank, he also denies that such money ever in fact existed. At trial, petitioner testified that his declaration that he had $35,000 cash in his possession was false and that the Canadian authorities failed to verify his declaration. Petitioner signed that declaration and certified to its accuracy. According to petitioner, he made the false declaration on the advice of an attorney named Bernard Lefebvre to prevent the Canadian authorities from questioning petitioner's means of support, apparently in contemplation of moving to Canada. We note the immigration record also indicates petitioner's intent to transfer an additional $90,000 to Canada. We again reject petitioner's attempts to alter the stipulations of fact as executed by the parties. Rule 91(e), Tax Court Rules of Practice and Procedure.↩ We again note that this is another instance where we find petitioner's sworn testimony to be unworthy of belief. *. Possibly petitioner's oldest daughter, Angela Beth Boggs, who was then 18 years old. ↩**. Petitioner's son, who was then 10 years old. ↩10. The parties are in agreement that the source of this deposit consisted of a $10,000 cash down payment petitioner received from the sale of certain Canadian real property during his 1974 taxable year, and petitioner has conceded the propriety of respondent's capital gains adjustment with respect thereto for taxable year 1974. Accordingly, respondent does not contend herein that the amount of such deposit represents taxable income to petitioner under the bank deposits method.↩11. Petitioner's explanation of the nature of his alleged financial dealings with Lucas has not always been consistent. At trial and also during an interview with Canadian revenue agents held at petitioner's home in Luray, Virginia on December 14, 1976, petitioner asserted that Lucas had loaned him the monies at seven percent interest. However, the petitioner filed herein makes no reference to a loan from Lucas at seven percent, instead alleging that petitioner was depositing the monies as Lucas' investment agent, for which petitioner was to receive a commission equal to two percent annual interest on the principal of such deposits.↩12. At trial, petitioner described the camper as costing at least $40,000 and having Quebec license plates. This testimony contradicts petitioner's statements concerning the camper made during petitioner's interview with Canadian revenue agents on December 14, 1976, where petitioner denied the man drove a camper with Quebec license plates. The memorandum of such meeting submitted as a joint exhibit indicates that petitioner had earlier told the Canadian revenue agents that Lucas was from Quebec and drove a camper with Quebec license plates. While this is a trivial discrepancy, the Court notes that petitioner's testimony varied to suit the occasion and varied on the trivial as well as the significant. ↩13. Petitioner has vacillated in his recollection as to when he learned of these events. During the December 14, 1976 interview with the Canadian revenue agents, petitioner stated he had only learned during the "previous week" that the man was from South America and had lost his business when the country turned Communist, but had managed to smuggle approximately $500,000 out of the country. However, at trial, petitioner said he learned during the first seven to ten days together that the man was from Chile and had escaped that country durint the Communist takeover. Further, at trial petitioner denied knowing how much money the man had managed to escape with, but estimated the amount to be between three and five million dollars. When confronted with these inconsistencies, petitioner claimed he had no recollection of making the above statements to the Canadian revenue agents, had lied to them if he did, and that the agents had their figures confused as to the amount of money petitioner said had been smuggled out.↩14. During the December 14, 1976 interview with the Canadian revenue authorities, petitioner similarly refused to arrange a meeting between Lucas and the Canadian agents under any circumstances, again on the ground that the CIA was trying to assassinate Lucas because of his South American activities.↩15. Petitioner told the Canadian revenue agents during the December 14, 1976 interview that Lucas had given him approximately $425,000 cash on a piecemeal basis over a period of a few months prior to January 3, 1973, when he deposited that sum in Canada. Further, with regard to the $38,000 deposit to the Bank of Nova Scotia on June 7, 1973, petitioner told the Canadian revenue agents such deposit was made with a bank draft he had purchased with cash given him by Lucas, indicating he would provide the agents with the draft for their inspection. Petitioner denied making these inconsistent statements when confronted therewith at trial.↩16. While the record is not entirely clear, during the December 14, 1976 interview with the Canadian revenue agents, petitioner apparently indicated he had only borrowed a total of $463,000 from Lucas.↩17. Respondent has suggested that petitioner in fact signed his children's names to the CD's. We note that a comparison of certain common letters, particularly the "gg's" in Boggs, in all the signatures does disclose a striking similarity to petitioner's signature. If the point were critical, we would find as a fact that petitioner did sign the names of all of his children, the registered owners of the six CD's.↩18. The petition herein alleges that only $300 of this amount made its way into the September 11, 1973 deposit, and petitioner has offered no explanation for this discrepancy.↩19. On his 1974 Federal income tax return, petitioner originally reported no gain from the sale of the Canadian residence, but has since conceded the correctness of respondent's determination that petitioner realized a taxable gain upon the sale in the amount of $5,294.55, and that petitioner failed to report interest income received under the mortgage thereon in the amounts of $313.54, $3,749.95, and $3,725.04 for his 1974, 1975, and 1976 taxable years, respectively.↩20. Other than his unsupported and self-serving testimony, petitioner has offered no competent evidence in support of his claim regarding the source of this portion of the $5,000 deposit to the Royal Bank on November 10, 1975. At trial, petitioner offered into evidence a document purporting to be a handwritten statement from Mr. Brown dated August 11, 1981, acknowledging his payment of $4,000 to petitioner during October of 1975 for overdue mortgage installments, but such document was excluded as hearsay.↩21. During the December 2, 1976 interview with Agent Weaver, petitioner originally said that the Canadian residence had been purchased through a loan from a Canadian bank. However, during the subsequent interview on March 4, 1977, petitioner told Agent Weaver the Canadian residence had been purchased with part of the money allegedly received from Lucas. During this latter interview, petitioner also indicated to Agent Weaver that he had received a total of $585,000 from Lucas during the years at issue, using $40,000 thereof to purchase the Canadian residence, and another $40,000 or $41,000 for personal expenditures. Petitioner now claims to have received a total of only $543,736.64 from Lucas represented by certain of the bank deposits heretofore discussed. He further denies telling Agent Weaver that he had used $40,000-$41,000 of the money received from Lucas for personal expenses, and denies that he did in fact so use such money. Again the Court notes that petitioner frequently changes his story and seems to say whatever he thinks is in his best interest at the moment.↩22. This includes the deposits which represented transfers of principal and interest from other accounts. See n. 8, supra.↩1. While the record does not clearly indicate, the inference is that the aggregate amount deposited into these banks was divided into relatively equal amounts for the purchase of the respective CD's. ↩2. The manner in which this deposit and several others included herein are listed rebuts petitioner's uncorroborated contention that Canadian banks do not allow deposits to be listed in more than one name. ↩3. Later changed to 311 Robins Court, Niagara, Ontario. ↩4. Later changed to 1042 Lakeshore Drive, Sudbury, Ontario.↩23. Some of the names utilized in these deposits appear to be those of former employees of petitioner's dental practice; some of the names were relatives of such employees. Others appear to be derivations of names of petitioner's former employees.↩24. Petitioner and his wife were subsequently divorced in 1977.↩25. We do not include herein the $10,000 deposit made to the Royal Bank in the name of "Gere Boggs, in trust" on October 28, 1974, representing the $10,000 cash down payment which petitioner received from the sale of the Canadian residence. As petitioner has conceded the capital gains issue, see n. 10, supra,↩ respondent no longer contends the amount of such deposit represents unreported income. We note, however, that on January 19, 1976, the balance of this account, $11,019.63, was likewise transferred into a new account at the King Street branch of the Royal Bank under the same account name, but with a fictitious address.1. This address is fictitious. ↩2. Petitioner offers no explanation as to why the designation of "in trust" was deleted from the new account name which, according to petitioner, was used by the Canadian banks to designate the account as jointly owned. Also since this account was listed as Mr.↩ A. B. Boggs, there is doubt as to whether the A. B. refers to petitioner's daughter or to a fictitious name used by petitioner himself.26. Dollar amounts are stated in U.S. currency. In his notice of deficiency, respondent has allowed petitioner a long-term capital loss in the amount of $15,146.22, on the conversion of the aggregate amount of such monies from Canadian currency to U.S. currency and has utilized such loss to offset in full the amount of short-term capital gain reported on petitioner's 1976 return and has also allowed petitioner a further deduction with respect to this long-term capital loss in the amount of $1,000 for taxable year 1976. See sec. 1211(b). Petitioner has assigned no error to this determination. See Rule 34(b)(4), Tax Court Rules of Practice and Procedure.↩27. A joint exhibit submitted by the parties indicates that the difference between the amounts originally deposited to these four accounts, $39,433.92, and the amounts withdrawn therefrom via the bank draft payable to Lucas, $69,866.76, is attributable to "interest on other accounts," apparently in reference to some of the other Canadian accounts closed at this time, but provides no explanation thereof. We note that only the ownershio of such funds, as opposed to the correct amount thereof, is the issue before us. ↩28. Petitioner did not explain and we fail to perceive how the prevailing currency exchange rate, a flat rate merely applied to the total amount exchanged, could in any way influence the manner by which the funds were withdrawn from the Canadian banks.↩29. The pleadings do not identify the particular deposits to which such interest is attributable.↩30. We note that this explanation is consistent with petitioner's sometime position that he held the Lucas deposits as his agent for investment purposes (the position set out in his petition herein) but is inconsistent with his general position at trial that the Lucas deposits represented "loans" Lucas had made to him. See n. 11, supra.↩31. At trial, petitioner also made a vague reference to an alleged rise in the value of the Canadian dollar against the U.S. dollar, with a concomitant reduction in the interest thereby earnable on the deposits of U.S. currency, as a factor which prompted the withdrawal of the funds from the Canadian banks. However, the deposited funds were then in Canadian currency and were converted to U.S. dollars at a loss only when withdrawn (see n. 26, supra↩). In any event, due to the vagueness of petitioner's testimony thereon, we are unable to discern the extent to which this alleged factor influenced petitioner's decision to withdraw the money from the Canadian banks, if at all. Moreover, it is clear from petitioner's testimony that the dominant factors which petitioner claims to have prompted the withdrawal were the desire to change the form of the alleged "investment" and to avoid further seizure of such funds by the Canadian revenue authorities. 32. In spite of this vigorous action by Canadian revenue authorities to collect, petitioner testified at trial that he had been told by a Canadian revenue agent to just ignore the Canadian tax and the slate would be wiped clean. The Court did not believe petitioner's incredible explanation of why he did not file Canadian tax returns or pay the Canadian tax that had been assessed.↩33. Mr. Waters described the man as being well dressed, approximately 5'8" to 5'10" tall, dark complexion with dark wavy hair, and wearing dark plastic glasses. The description given by Mr. Waters matches that of two other witnesses who were introduced by petitioner to a man allegedly named A. W. Lucas.↩34. Mr. Waters has subsequently tried to locate Lucas, but his efforts have been to no avail. Mr. Waters has asked petitioner on several occasions about Lucas' whereabouts, only to be told by petitioner that he would never see Lucas again. Mr. Waters indicated at trial that during these conversations petitioner did make some reference to the CIA, but not with regard to Lucas. Mr. Waters also testified before the grand jury investigating petitioner's criminal tax liability for some of the years at issue. Prior to such testimony, petitioner telephoned Mr. Waters late at night to find out if he had talked with the IRS, and then asked Mr. Waters not to say anything to the IRS which would jeopardize petitioner in any way. ↩35. At trial, petitioner stated that Lucas accompanied him to the Stanley bank when the deposits thereto were made. The Court did not believe his testimony and found the testimony of Mr. Waters to be more credible.↩36. Mr. Bosley has had limited contacts with petitioner, having had some dental work performed by petitioner in the early 1970's and also performing occasional mechanical work on petitioner's automobiles. Mr. Bosley on one occasion has also had a conversation with petitioner concerning the possibility of investing in "turkey houses," but does not recall anyone being with petitioner during such conversation.↩37. In her testimony before the grand jury, Ms. McGuire denied signing the name A. W. Lucas to the deposit slip used to make the initial deposit to the Lucas savings account on July 14, 1976. However, a visual comparison thereof with other signatures she admitted making reveals a striking similarity between such signatures. We note, however, that the $108,742.80 bank draft drawn on the Bank of Montreal has been endorsed in the name of A. W. Lucas two separate times, only one of which Ms. McGuire acknowledges making. Ms. McGuire could not identify the other signature, and it appears to have been made by another person. In any event, it is clear that petitioner does not contend that anyone other than Ms. McGuire signed any of these documents. Petitioner contended that the alleged Mr. Lucas, admittedly a fictitious name, could not sign his fictitious name for fear that his signature could somehow be "traced" and his true identity revealed, a store the Court found wholly incredible.↩38. Ms. McGuire did not talk to the attorney herself nor seek independent verification of what petitioner told her the attorney had said.She just took petitioner's word for it.↩39. The parties stipulated that Ms. McGuire made both of the endorsements in Lucas' name and that petitioner brought both Canadian bank drafts to her for that specific purpose. Petitioner nonetheless testified at trial that he was unaware of the presence of Lucas' alleged endorsement thereon and could offer no explanation thereof. The Court will not relieve petitioner of the stipulation, particularly since his testimony is unworthy of belief. ↩40. We note that both CD's bear the same Social Security No. 230-70-XXXX. We also note that Gere Boggs was only 12 years old at that time.We note that both CD's bear the same Social Security No. 230-70-XXXX. We also note that Gere Boggs was only 12 years old at that time.↩41. At trial, petitioner claimed that Lucas had telephoned Mr. Waters and orally authorized the $10,000 withdrawal from the Lucas savings account. However, at trial Mr. Waters denied ever speaking to Lucas after their initial introduction in early July. The Court found Mr. Waters to be a more credible witness than petitioner. ↩42. At trial, petitioner introduced into evidence a $175 check payable to Lucas and dated December 14, 1976, drawn on petitioner's account at the First National Bank of Luray, which petitioner claims represents payment of interest on the alleged $10,000 loan from Lucas. Petitioner stated at trial that he mailed this check to the Stanley bank with instructions that it be deposited to the Lucas savings account. However, the evidence of record is conflicting as to whether this check was in fact deposited to the Lucas savings account, or was cashed instead. Petitioner ultimately closed out the Lucas savings account and the Court is satisfied that the $175 ended up in petitioner's pocket, whether directly or through a more tortuous path. Petitioner further claims that he repaid this loan to Lucas between 1978 and 1980 with cash generated by selling his Valley Gas Corporation interest to his son in exchange for certain CD's allegedly owned by his son. Petitioner's son was admittedly very young at the time (14-16) and petitioner admittedly handled both sides of the alleged transaction. Petitioner produced no documentary evidence as to this alleged loan repayment, and the Court does not accept his uncorroborated, self-serving testimony.↩43. The Court found Agent Weaver to be a forthright and credible witness and accepts his testimony that petitioner in 1977 denied having any interest in the Valley Gas Corporation.↩44. We note that petitioner did report on his 1976 return $700 of interest income received from Valley Gas Corporation.↩45. We note that by this time Revenue Canada had already seized some Canadian bank accounts maintained by petitioner to satisfy assessments of Canadian income tax determined for his 1974 and 1975 taxable years and, while the record is not clear, we think it quite likely that an initial contact with petitioner had been made by the Criminal Investigation Division of IRS concerning the investigation of petitioner's criminal tax liability for the years in issue. ↩46. Mr. Bushey did not appear at the trial. While the record does not indicate exactly what petitioner allegedly told Mr. Bushey, it does clearly reveal that petitioner failed to fully apprise him of the entire details allegedly surrounding the Lucas transaction, particularly with regard to the amount of money petitioner claims to have borrowed from Lucas. We note that in four different instances petitioner claims to have sought, and more or less followed, the advice of an attorney. None of these attorneys appeared at the trial. From the nature of the legal advice purportedly given, such as advice to falsify a Canadian Immigration declaration, the Court doubts that petitioner contacted these attorneys, and if he did the Court doubts that the attorneys gave the advice petitioner claims they gave.↩47. The structuring of this withdrawal is in stark contrast to the manner in which petitioner claims Mr. Bushey advised him to make the withdrawal. See n. 46, supra.↩48. At trial, despite being presented with these 14 cashier's checks which were given to her by the Stanley bank along with $24,000 cash in exchange for the $694,000 cashier's check payable to Lucas, Mrs. Remilli vehemently denied receiving such checks and was adamant in her assertion that she received $24,000 in cash and only one cashier's check in the total amount of $670,000 in exchange for the $694,000 cashier's check payable to Lucas. Mrs. Remilli's obstinate and inexplicable refusal to accept the objective facts on this point, and the generally evasive and argumentative manner in which she responded to the questions put to her at trial, adversely affect the credibility of her testimony.↩49. When asked to explain the one week's delay before she took the 14 cashier's checks to the Richmond bank to have them cashed, Mrs. Remilli made vague reference to a "questioning" by the IRS Miami, Florida office which she attended during this period. Mrs. Remilli did not indicate whether this "questioning" related to the issues before the Court or other matters. She did testify, however, that she kept the $24,000 cash received from the Stanley bank in her possession during this period, and the natural inference from her testimony is that she also had the 14 cashier's checks in her possession. Mrs. Remilli did not tell the Miami office of the IRS that she was holding these checks because, in her own words, "I wasn't asked about holding any checks."↩50. Petitioner and Mrs. Remilli contended that they had not told anyone prior to the trial of their alleged visit with their family friend in the nursing home, purportedly to protect their alleged family friend's son, a judge, from some sort of unexplained embarrassment. However, assuming they were concerned about the friend's "embarrassment," they did not explain why they chose that particular nursing home for the alleged rendezvous with Lucas.↩51. At an earlier point in his testimony, petitioner had testified that the "loans" he claims were evidenced by certain of the bank deposits in issue had been fully repaid in Canada when petitioner allegedly gave the Canadian bank drafts to Lucas. Petitioner has offered no explanation for this seemingly incongruous claim. See also n. 46, supra.We note also that while not claimed on his 1976 return, the petition herein, relying on the theory that petitioner was merely acting as Lucas' agent in depositing the funds in return for a commission equal to two percent of the principal "invested" per year, asserted that petitioner had repaid Lucas $39,156.41 more than the total due him, claiming a loss therefore in like amounts under section 165(c)(2) for petitioner's 1976 taxable year. That loss claim was abandoned at the trial.↩52. This only illustrates the inconsistencies in the testimony of mother and son. The record does not explain how Mrs. Remilli could have obtained the receipt. Since petitioner admittedly transported the receipt document to and from Ms. McGuire to affix Lucas' "signature" thereto, the logical inference would be that petitioner either gave the receipt to Mrs. Remilli to hand to Lucas to hand back to her or that petitioner himself gave the receipt to the man introduced to his mother as A. W. Lucas. Either scenario borders on the farcical.↩53. At trial, petitioner also elicited testimony from both Mr. Dodson and Mr. Campbell concerning what they described as petitioner's "conservative" life-style and their general impression that petitioner did not live in a manner which indicated he had a great deal of money, such impressions being based on their contacts with petitioner in the area of Luray, Virginia. The parties also submitted exhibits pertaining to loans received by petitioner from 1963 to 1976, inclusive, which indicate that during the taxable years in issue petitioner received several relatively short-term loans totalling $47,000 from the Stanley bank, all of which appear to have been timely repaid. While we have considered such evidence in reaching our decision herein, we have attached little weight thereto because such evidence does very little to resolve the question of whether the monies deposited into the Canadian bank accounts at issue represent nontaxable loan proceeds from Lucas or unreported income of petitioner and, if the latter, petitioner's liability for the fraud addition.↩54. Petitioner's claim at trial that he had been advised by Canadian revenue authorities that it would be unnecessary for him to do so is contradicted by the evidence of record. As late as May 16, 1980 Revenue Canada was still seeking payment of Canadian income taxes for certain of the years in issue. See n. 32, supra.↩55. The $21,000 figure was adjusted to reflect the parties' stipulation that $17,000 of this deposit represented fire insurance proceeds. See Part III, infra.↩56. The amount of the deposit is stated in U.S. currency, and is adjusted to reflect the parties' stipulation that $1,000 thereof represented a transfer of previously existing funds.↩57. Petitioner did not explain how both levels in an A-frame house could be the same size. ↩58. Petitioner indicated he had at one time been involved in a construction company and was apparently basing his estimate on his alleged experience therein. Petitioner offered no other evidence to support this estimate or his qualification to render said estimate.↩59. Petitioner indicated at trial that all of their property was subsequently "transferred" to their children. No documentary evidence was presented to substantiate petitioner's uncorroborated, self-serving testimony and we accord little weight to his testimony.↩60. We reject petitioner's assertion at trial that this referred to G. V. Boggs, Jr., his son. Not only does the document itself fail to so indicate, we also note that as petitioner's son was his youngest child, this claim is in direct contradiction to petitioner's claim at trial that he wanted to place the deed in the control of his two oldest children. The son was 9 to 12 years old during the years involved in this case.↩61. The record does not indicate the exact date of the presentation of that original document, but it was, in any event, long after petitioner claims to have given the deed to his two children. The earliest meeting with Agent Weaver occurred on December 2, 1976.↩62. At trial, petitioner asserted that Toothacres is currently occupied by his son as the latter's full-time residence, petitioner indicating that he now only lives there during the period of time he is in Virginia, which he estimated to be 25 percent of the time. Petitioner estimated he spent the remaining 75 percent of his time at his current primary residence in Crab Run, West Virginia.↩63. Although the petition places in issue the entire amount of this adjustment, petitioner's position throughout has been that the $17,000 of the total insurance proceeds attributable to the dwelling at Toothacres and its contents is properly taxable to petitioner's children, asserting they were the owners of Toothacres pursuant to the purported conveyance to them in 1974. As such, we think petitioner has conceded that he is properly taxable on the remaining amount of the insurance proceeds received, $2,153.28, and accordingly sustain the portion of respondent's adjustment attributable thereto, $1,076.64.↩64. While we think it likely that the taxable income generated by petitioner's dental practice in 1973 alone could not have funded the entire amount of the $207,500.00 and $217,936.64 deposits to the Bank of Nova Scotia on February 27, 1973 and April 11, 1973, respectively, petitioner has not persuaded us that some portion of those deposits did not derive therefrom, nor that some portion, if not the entire amount of the remaining deposits in issue, did not derive from the dental practice. In any event, as we have heretofore determined, we do not view respondent's position herein as limited to relying upon petitioner's dental practice as the sole source of the unreported income he has determined to exist for the taxable years in issue. ↩65. As such invoices were apparently not within petitioner's possession, we do not here invoke the doctrine of Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513↩ (10th Cir. 1947), and give rise to a negative inference resulting from petitioner's failure to produce such documents. However, petitioner's failure to corroborate his testimony through documentary evidence from third-party sources, particularly in those instances where such documentary evidence not only should exist but is in fact alleged to exist and to be readily accessible, bears heavily upon the weight to be given to his self-serving testimony.66. In light of Mrs. Remilli's refusal to accept clearly incontrovertible objective facts of record and her generally evasive and argumentative responses to questions put to her at trial, all of which adversely impact upon her credibility as a witness, we attach little or no corroborative value to her testimony as to the alleged return of the money to Lucas. Assuming Mrs. Remilli actually engaged in that farcical exchange of 6,700 $100 bills for the Lucas receipt that had been signed by petitioner's girlfriend at his request, the Court would only conclude that petitioner had shamelessly used his mother in his scheme to try to give verisimilitude to an inherently incredible tale.↩67. As indicated earlier, the parties have stipulated as to the source of $17,000 of the total deposit on September 9, 1974, the entire $10,000 deposit on October 28, 1974, and $1,000 of the deposit on November 10, 1975, and respondent has not treated such amounts as taxable income under his bank deposits analysis.↩68. The $10,000 deposited to the Royal Bank on October 28, 1974 represented the sales proceeds of the Canadian residence as to which petitioner concedes ownership. As to the $17,000 deposited to the Royal Bank on September 9, 1974, which the parties have stipulated to be attributable to fire insurance proceeds from the fire at Toothacres, see Part III, infra. Finally, with respect to the $1,000 deposited to the Royal Bank on November 10, 1975, which the parties have stipulated represented pre-existing funds withdrawn from the passbook savings account maintained in the name of "Gere Boggs, In Trust," petitioner has presented no evidence related thereto sufficient to overcome inferences drawn from other evidence of record that such savings account belonged to petitioner's son in name only, petitioner being the true owner thereof. Cf. Corliss v. Bowers,281 U.S. 376, 378↩ (1930).69. See n. 63, supra.↩70. See also Raymond v. Commissioner,T.C. Memo. 1983-607, affd. without published opinion 760 F. 2d 260↩ (3rd Cir. 1985).71. See n. 64, supra.↩